**Eleanor McCULLEN, Jean Blackburn Zarrella, Gregory A. Smith, Carmel Farrell, and Eric Cadin, Plaintiffs,**

v.

**Martha COAKLEY, in her capacity as Attorney General for the Commonwealth of Massachusetts, Defendant.**

**Civil Action No. 08–10066–JLT.**

United States District Court,
D. Massachusetts.

Aug. 22, 2008.

Benjamin W. Bull, Alliance Defense Fund, Scottsdale, AZ, Kevin H. Theriot, Alliance Defense Fund, Leawood, KS, Michael J. DePrimo, Hamden, CT, Philip D. Moran, Salem, MA, Timothy D. Chandler, Alliance Defense Fund, Folsom, CA, for Plaintiffs.

Kenneth W. Salinger, Massachusetts Attorney General's Office, Anna–Marie L. Tabor, Office of the Attorney General, Boston, MA, for Defendant.

### MEMORANDUM

TAURO, District Judge.

### Introduction

Plaintiffs challenge the facial constitutionality of a recently revised Massachusetts statute, Mass. Gen. Laws ch. 266, § 120E 1/2 ("Act"), which establishes a 35–foot fixed buffer zone around driveways and entrances of reproductive health care facilities ("RHCFs").[1] Following a Bench Trial held on May 28, 2008, this court finds that the Act survives First Amendment, Equal Protection and Due Process challenges.

### Background

#### A. The Parties

Plaintiffs Eleanor McCullen, Jean Blackburn Zarrella, Gregory A. Smith, Carmel Farrell and Eric Cadin are Massachusetts residents who regularly engage in pro-life counseling outside RHCFs.[2] Defendant Attorney General Martha Coakley is the chief lawyer and law enforcement officer of the Commonwealth of Massachusetts. As such, Attorney General Coakley bears responsibility for enforcing the Act. She is sued in her official capacity only.[3]

#### B. Procedural History

On January 16, 2008, Plaintiffs filed the Complaint, advancing eight counts under 42 U.S.C. § 1983: (1) Free Speech—Time, Place and Manner; (2) Free Speech—Substantial Overbreadth; (3) Free Speech—Prior Restraint; (4) "Free Speech—Free Association—Free Exercise Hybrid;" (5) Free Speech—Viewpoint Discrimination; (6) Due Process—Vagueness; (7) Due Process—Liberty Interest; and (8) Equal Protection.[4]

Plaintiffs seek that this court: (1) declare that the Act is unconstitutional on its face; (2) declare that the Act is unconstitutional as applied at the Allston–Brighton Planned Parenthood and Women's Health Service; (3) preliminarily[5] and permanently enjoin Defendant from enforcing the Act; (4) award costs and attorneys fees; and (5) grant any other relief that this court deems necessary and proper.[6]

---

1. An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E 1/2 (2007)) (Trial Ex. 1)[# 36]. The Act revised parts of Mass. Gen. Laws ch. 266, § 120E 1/2 (2000) (Trial Ex. 3)[# 38].

2. See Decl. of Eleanor McCullen (Trial Ex. 4)[# 39]; Decl. of Jean Blackburn Zarrella (Trial Ex. 5)[# 40]; Decl. of Carmel Farrell (Trial Ex. 6)[# 41]; Decl. of Eric Cadin (Trial Ex. 7)[# 42]; Decl. of Gregory A. Smith (Trial Ex. 8)[# 43].

3. See Compl. at 3[# 1].

4. See id. at 13–22[# 1].

5. Pls.' Mot. for Prelim. Inj. [# 2].

6. See Compl. at 22–23.

Following Defendant's Answer, and briefing on Plaintiffs' preliminary injunction motion, this court held a Case Management Conference on April 23, 2008. Without objection from the Parties, this court ordered that the matter proceed on the merits in two stages:[7] (1) a Bench Trial on Plaintiffs' facial challenge; and (2) a Bench Trial on Plaintiffs' as-applied challenge.[8]

In early May 2008, the Parties stipulated to the content of the Trial Record for the facial challenge,[9] and filed a Joint Trial Record with this court.[10] On May 14, 2008, the Parties filed Proposed Findings of Fact and Conclusions of Law.[11] Also on May 14, 2008, four individuals filed an Amicus Brief in support of Plaintiffs' facial and as-applied challenges.[12]

On May 28, 2008, this court held a Bench Trial on Plaintiffs' facial challenge. The Parties presented extensive oral argument, and this court took the matter under advisement.[13]

## Factual Findings

### A. Notes on Factual Findings

#### 1. Source

The following findings of fact derive from the Joint Trial Record submitted by the Parties. Additionally, this court takes notice of the findings of the First Circuit with respect to the legislative justification for the original statute enacted in 2000 ("2000 Act").[14]

#### 2. Focus on Facial Challenge

Plaintiffs urge this court to adopt various findings of fact relating to, among other things, the following: Plaintiffs' activities at certain RHCFs; specific incidents at certain RHCFs; and the operation of the buffer zone at certain RHCFs.[15]

---

7. This court denied Plaintiffs' *Motion for Preliminary Injunction* without prejudice to re-raising similar issues in a Bench Trial on the merits. *See* Order [# 34].

8. *See id.*

9. *See* Joint Stipulation as to the Content of the Trial R. for the Bench Trial of Pls.' Facial Challenge [# 35].

10. *See* Trial Exs. 1–29 [Docket Nos. 36–66].

11. *See* Pls.' Proposed Findings of Fact and Conclusions of Law [# 69] ("PFF"); Def.'s Proposed Findings of Fact and Conclusions of Law [# 70] ("DFF").

12. Mem. of Amicae Curiae [# 71].

13. On June 3, 2008, Plaintiffs filed a *Motion for Leave to File Post–Argument Brief on the Trial of Facial Challenge* [# 72], which Defendant opposed. *See* Opp'n to Pls.' Mot. for Leave to File a Post–Trial Brief [# 73]. This court denied Plaintiffs' motion. *See* Electronic Order dated June 5, 2008. On June 16, 2008, this court received a preliminary copy of the Bench Trial Transcript ("Prelim. Bench Trial Transcript").

14. *See McGuire v. Reilly*, 260 F.3d 36, 39–41 (1st Cir.2001) ("*McGuire I* "); *McGuire v. Reilly*, 386 F.3d 45, 48–49 (1st Cir.2004) ("*McGuire II* "). *See also, e.g., Daggett v. Comm'n on Governmental Ethics and Election Practices*, 205 F.3d 445, 456 n. 9 (1st Cir. 2000) ("The Rules of Evidence state that the court may take judicial notice of legislative facts whether requested or not. *See* Fed. R.Evid. 201(c). A 'legislative fact' is defined as 'one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' Fed.R.Evid. 201(b)."); *Daggett v. Comm'n on Governmental Ethics and Election Practices*, 172 F.3d 104, 112 (1st Cir.1999) ("[S]o-called 'legislative facts,' which go to the justification for a statute, usually are not proved through trial evidence but rather by material set forth in the briefs, the ordinary limits on judicial notice having no application to legislative facts.") (*citing* Fed.R.Evid. 201 advisory committee's note; *Knight v. Dugger*, 863 F.2d 705, 742 (11th Cir.1988)).

15. *See* PFF at 2–10.

Additionally, Defendant asks this court to adopt certain findings of fact relating to the effects of the Act, to date, at certain RHCFs.[16] While this information may be important to Plaintiffs' as-applied challenge, it is largely irrelevant to the facial challenge. Moreover, because the as-applied challenge will be tried separately, this court does not have a complete record from which to make such findings.

## B. History of the 2000 Act

As noted by the First Circuit, "[b]y the late 1990s, Massachusetts had experienced repeated incidents of violence and aggressive behavior outside RHCFs."[17] These included a shooting that occurred on December 30, 1994, in which two people were killed and several others injured.[18] Massachusetts courts also issued numerous injunctions prohibiting certain individuals from engaging in violent, harassing or intimidating activity at RHCFs.[19]

Responding to these concerns, "the Massachusetts legislature, confronted with an apparently serious public safety problem, investigated the matter thoroughly."[20] "That investigation yielded solid evidence that abortion protesters are particularly aggressive and patients particularly vulnerable as they enter or leave RHCFs."[21]

Part of the investigation included a state senate hearing on the matter in April of 1999.[22] At the hearing, the "received testimony chronicled the harassment and intimidation that typically occurred outside RHCFs."[23] In addition, "numerous witnesses addressed the emotional and physical vulnerability of women seeking to avail themselves of abortion services, and gave accounts of the deleterious effects of overly aggressive demonstrations on patients and providers alike."[24]

The senate, "[b]ased in part on this testimony, ... concluded that existing laws did not adequately protect public safety in areas surrounding RHCFs," and the Legislature began considering new laws to address the problem.[25] Initially, in Senate Bill 148, the senate considered a 25–foot fixed buffer zone around RHCF entrances and driveways. The First Circuit explained:

> To remedy this situation, the senate favored the creation of fixed buffer zones. The sponsors of the bill left no doubt that they intended the proposed law to "increase public safety in and around [RHCFs]" while "maintaining the flow of traffic and preventing congestion" there. S.B. 148 ... § 1. In the bargain, the sponsors expected the law to provide "reasonable time, place and manner re-

16. See DFF at 16–18.

17. McGuire I, 260 F.3d at 38.

18. See id. at App. B.

19. See, e.g., Planned Parenthood League of Mass., Inc. v. Bell, 424 Mass. 573, 677 N.E.2d 204 (1997); Commonwealth v. Filos, 420 Mass. 348, 649 N.E.2d 1085 (1995); Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 631 N.E.2d 985 (1994); Commonwealth v. Cotter, 415 Mass. 183, 612 N.E.2d 1145 (1993); Commonwealth v. Brogan, 415 Mass. 169, 612 N.E.2d 656 (1993); Planned Parenthood League of Mass., Inc. v. Operation Rescue, 406 Mass. 701, 550 N.E.2d 1361

(1990); Commonwealth v. Manning, 41 Mass. App.Ct. 696, 673 N.E.2d 73 (1996).

20. McGuire I, 260 F.3d at 44.

21. Id.

22. Id. at 39.

23. Id. For copies of the written testimony received by the senate, see Exhibits A–F to the Affidavit of Richard A. Powell (Trial Ex. 29) [# 66–2–7]. The testimony includes numerous specific observations and incidents.

24. Id.

25. Id.

strictions to reconcile and protect both the First Amendment rights of persons to express their views near reproductive health care facilities and the rights of persons seeking access to those facilities to be free from hindrance, harassment, intimidation and harm." It thereby would "create an environment in and around reproductive health care facilities which is conducive towards the provision of safe and effective medical services . . . to its patients." *Id.*

Skeptics worried that the proposed law might offend the Constitution. To stave off these gloom-and-doom predictions, the senate, on November 3, 1999, asked the Massachusetts Supreme Judicial Court (SJC) for an advisory opinion on the bill's constitutionality.

On January 24, 2000, the SJC concluded that the Constitution presented no obstacle to enactment. *Opinion of the Justices to the Senate*, 430 Mass. 1205, 1211–12, 723 N.E.2d 1 (2000). The SJC advised that the bill, as framed, was unrelated to the content of protected expression. *Id.* at 1209, 723 N.E.2d 1Moreover, the restrictions imposed had a rational basis in view of the heightened governmental interest that arises when "advocates of both sides of one of the nation's most divisive issues frequently meet within close proximity of each other in the areas immediately surrounding the State's clinics, in what can and often do become congested areas charged with anger." *Id.* at 1210, 723 N.E.2d 1.[26]

Following the SJC's opinion, the state senate adopted the bill on February 29, 2000.[27] On June 28, 2000, however, the Supreme Court decided *Hill v. Colorado*,[28] There, the Court considered the constitutionality of a Colorado statute that regulated speech-related conduct around RHCFs.[29] The statute created a "floating" buffer zone within a 100–foot "fixed" buffer zone.[30] Plaintiffs challenged the "floating" zone, which "ma[de] it unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person. . . .'"[31]

The Court upheld the Colorado statute as a valid time, place and manner regulation, finding that the law was "narrowly tailored" and "serve[d] governmental interests that are significant and legitimate and that the restrictions are content neutral."[32] This court will address *Hill* in more detail below.

## C. The 2000 Act[33]

Subsequently, the Massachusetts Legislature decided to follow the Court-approved Colorado model of a "floating" buffer zone within a "fixed" buffer zone. The state house redrafted Senate Bill 148 accordingly, and on July 28, 2000, adopted an Act Relative to Reproductive Health Care Facilities, Chapter 217 of the Acts of 2000 ("2000 Act").[34] The senate approved on

26. *Id.* at 39–40 (spacing modified).

27. *Id.* at 40.

28. 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

29. *See id.* at 707, 120 S.Ct. 2480.

30. *See id.*

31. *Id.*

32. *Id.* at 725–26, 120 S.Ct. 2480.

33. Judge Harrington, at the trial level, and the First Circuit on appeal, have adjudicated the constitutionality of the 2000 Act, and much of the information in this section draws from their discussions in the *McGuire* line of cases.

34. *See McGuire I*, 260 F.3d at 40; Mass. Gen. Laws ch. 266, § 120E 1/2 (2000) (Trial Ex. 3).

July 29, 2000, and Governor Celluci signed the bill on August 10, 2000.[35]

The 2000 Act created an 18–foot fixed buffer zone around RHCFs, within which a 6–foot floating buffer zone existed around any person or occupied motor vehicle:

(b) No person shall knowingly approach another person or occupied motor vehicle within six feet of such person or vehicle, unless such other person or occupant of the vehicle consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of 18 feet from any entrance door or driveway to a reproductive health care facility or within the area within a rectangle not greater than six feet in width created by extending the outside boundaries of any entrance door or driveway to a reproductive health care facility at a right angle and in straight lines to the point where such lines intersect the sideline of the street in front of such entrance door or driveway.[36]

The 2000 Act, however, exempted certain groups from its coverage:

(1) persons entering or leaving such facility;

(2) employees or agents of such facility acting within the scope of their employment;

(3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.[37]

Additionally, the provisions of the 2000 Act were only in "effect during a facility's business hours and [only] if the area contained within the radius and rectangle described in said subsection (b) is clearly marked and posted." [38]

## D. Attorney General's Guidance on the 2000 Act

On November 10, 2000, the Massachusetts Attorney General's office sent a letter to the Brookline and Boston police departments regarding the 2000 Act.[39] The letter explained the Attorney General's interpretation of the exemption for "employees or agents of such facility acting within the scope of their employment," [40] and "noted that if escorts were to approach within six feet of a woman within the fixed buffer zone in order to 'hurl[ ] epithets at demonstrators,' then their actions would not be within the scope of their employment and they would not be protected by the exemption." [41]

On May 23, 2001, members of the Attorney General's office met with staff from the Planned Parenthood League of Massachusetts, "to communicate the Attorney General's interpretation that the Act's exemption for clinic employees and agents acting within the scope of their employment would not protect such persons if they were to use the exemption to engage in counter-protests, counter-education, or counter-counseling against anti-abortion

---

35. See McGuire I, 260 F.3d at 40; Mass. Gen. Laws ch. 266, § 120E 1/2 (2000) (Trial Ex. 3).

36. Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2000) (Trial Ex. 3).

37. Id.

38. Id. § 120E 1/2(c).

39. See McGuire II, 386 F.3d at 52.

40. Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2000) (Trial Ex. 3).

41. McGuire II, 386 F.3d at 52.

views, rather than simply assisting the patients into the clinic and protecting clinic access." [42]

On February 14, 2003, an assistant attorney general issued a letter to the police departments with RHCFs affected by the 2000 Act.[43] The letter reiterated that " 'all persons in the restricted area, including clinic employees and agents, are subject to the restrictions in Section 120E 1/2(b) of the Act, including the restriction on oral protest, education, or counseling[,]' and that clinic employees and agents may not use the exemption to 'express their views about abortion[.]' " [44] As noted by the First Circuit, this letter "did not signify a new interpretation; it was merely a restatement of an old position. In this most recent clarification of the interpretation, the Attorney General has clearly construed the exemption to exclude pro-abortion or partisan speech from the term 'scope of their employment.' " [45]

### E.  *McGuire I* and *McGuire II*

Three pro-life "sidewalk counselors" [46] challenged the facial and as-applied constitutionality of the 2000 Act in a federal lawsuit in this District.  Judge Harrington found that the statute—on its face—violated the First Amendment, and preliminarily enjoined its enforcement pending a hearing on the merits.[47]

In *McGuire v. Reilly* ("*McGuire I*"), the First Circuit reversed, holding that the statute lawfully regulated the time, place and manner of speech without discriminating based on content or viewpoint, and remanded the case to the district court for further proceedings.[48]

On remand, the plaintiffs pressed facial and as-applied challenges on the merits. Based on the First Circuit's decision in *McGuire I*, Judge Harrington granted Defendants summary judgment on Plaintiffs' facial challenge,[49] but denied summary judgment on the as-applied challenge pending additional discovery and the filing of a renewed motion for summary judgment.[50]

After additional discovery, Judge Harrington granted Defendants summary judgment on the as-applied challenge.[51] On the issue of enforcement following *McGuire I*, Judge Harrington found that "the Act has since been interpreted by the Attorney General so as to require even-handed enforcement of its prohibitions, even against clinic employees and agents, and the Attorney General's interpretation has been adopted by the law enforcement authorities." [52]

In *McGuire v. Reilly* ("*McGuire II*"), the First Circuit affirmed summary judgment on both the facial and as-applied

---

**42.**  *Id.* Also during July of 2001, the Attorney General's office provided training consistent with its November 10, 2001 guidance letter to the Boston and Brookline police departments. *Id.*

**43.**  *McGuire v. Reilly*, 271 F.Supp.2d 335, 339 (D.Mass.2003) (Harrington, J.), *aff'd, McGuire II*, 386 F.3d 45 (1st Cir.2004).  Hereinafter, this court will refer to the letter as the "2003 Guidance Letter."

**44.**  *Id.* at 339–40.

**45.**  *McGuire II*, 386 F.3d at 52 n. 1.

**46.**  *Id.* at 48.

**47.**  *See McGuire v. Reilly*, 122 F.Supp.2d 97 (D.Mass.2000) (Harrington, J.), *rev'd, McGuire I*, 260 F.3d 36 (1st Cir.2001).

**48.**  *See McGuire I*, 260 F.3d 36.

**49.**  *See McGuire v. Reilly*, 230 F.Supp.2d 189, 193 n. 10 (D.Mass.2002) (Harrington, J.).

**50.**  *Id.* at 194.

**51.**  *See McGuire v. Reilly*, 271 F.Supp.2d 335 (D.Mass.2003) (Harrington, J.), *aff'd, McGuire II*, 386 F.3d 45 (1st Cir.2004).

**52.**  *Id.* at 341.

challenges.[53] *McGuire I* controlled the facial challenge, and the plaintiffs "offered no reason why the conclusion reached in *McGuire I* ... is flawed."[54] Additionally, the court concurred with Judge Harrington's assessment of the Commonwealth's enforcement position, holding that "[t]he Attorney General's interpretation ... is important for our purposes ... because it is clearly a proper, content-neutral way of interpreting the exemption."[55] With respect to the as-applied challenge, the court concluded that "there is no evidence that the police have enforced this statute in anything other than an evenhanded way...."[56]

## F. The Legislature Determines that the Statute Needs to be Revised

### 1. Proposed Senate Bill 1353

Following the passage and operation of the 2000 Act, members of the Legislature became aware of continued and serious public safety problems in the areas adjacent to RHCF entrances and driveways, including significant concerns regarding safe patient access to medical services.[57]

In 2007, responding to these concerns, several members of the Legislature introduced Senate Bill 1353, "An Act Relative to Public Safety." The proposed preamble read:

> Whereas preservation of public safety is a fundamental obligation of state government;
>
> Whereas pedestrians have a right to travel peacefully on Massachusetts streets and sidewalks; and
>
> Whereas clearly defined boundaries improve the ability of safety officials to protect the public;[58]

The bill modified the size and nature of the buffer zone:

> (b) No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of thirty-five feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance to, exit from or driveway of, a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway.[59]

The Legislature's Joint Committee[60] on Public Safety and Homeland Security ("Committee") held a public Hearing on the bill on May 16, 2007, and received written and oral testimony from law enforcement officials;[61] RHCF staff, volun-

---

53. *See McGuire II*, 386 F.3d 45.

54. *Id.* at 59.

55. *Id.* at 64.

56. *Id.* at 65.

57. *See, e.g.*, Hearing Transcript at 7–13 (legislators—including some of the bill's sponsors—discussing public safety concerns at RHCFs, problems with the 2000 Act, and the origins of Senate Bill 1353).

58. An Act Relative to Public Safety, S.B. 1353, 185th Gen. Court (Mass.2007) (enacted), Ex. A to Aff. of Adam T. Martignetti ("Martignetti Aff.") (Trial Ex. 24) [# 61–2]. Plaintiffs argue that the preamble constitutes "three very different facts underlying [the

bill's] purpose." Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 52[# 16]. This court disagrees. All three sections of the preamble clearly relate to public safety.

59. *Id.*

60. Members of the state house and senate serve on the Committee.

61. Captain Williams Evans ("Evans") of the Boston Police Department testified. Evans is the police commander for the South End, Back Bay, Lower Roxbury and Fenway sections of Boston. *See* Transcription of Videotape of Hearing of the Joint Committee on Public Safety and Homeland Security at 25 ("Hearing Transcript"), Ex. C to Aff. of Vineeth Narayanan ("Narayanan Aff.") (Trial

teers and representatives; and representatives of various advocacy organizations.[62] At the Hearing, the Committee also viewed video footage and photographs of protest activity at certain RHCFs.[63] Additionally, the Committee received written correspondence supporting and opposing the bill.[64]

## 2. Public Safety and Access to Medical Services

The Committee received testimony that, despite the 2000 Act's floating and fixed buffer zones, significant public safety concerns continued to exist at RHCFs in the Commonwealth, including major concerns regarding safe patient access to medical services. Attorney General Martha Coakley ("Coakley") explained that the fixed buffer zone was necessary to address the situation:

> This is an important public safety issue. Over the years, reproductive healthcare facilities have been the scene of mass demonstrations, congestion, blockages, disturbances, and even murders. SB 1353 will help ensure greater safety along our public ways and sidewalks and prevent violence, harassment and intimidation of women who are attempting to exercise their fundamental right to access health care.
>
> . . .
>
> I support the bill's recognition that "clearly defined boundaries improve the ability of safety officials to protect the public."
>
> . . .
>
> Facility employees, volunteers, patients and prospective patients are routinely harassed as they try to enter and exit

facilities for medical counseling and treatment. For example, at the Boston location, which has a recessed door, protesters are able to stand close to the entrance, with some protesters standing right at the entrance. Demonstrators regularly crowd facility entrances and surround women, facility employees and volunteers with graphic and discomfiting pictures of aborted fetuses, and shout at and taunt them calling them "baby killers" and "murderers."

. . .

[P]atients and employees are forced to step around or through the protestors as they make their way into the building. We have heard of some cases where women arrive at the facilities and then leave because they are too upset to pass through the gauntlet of protestors.

Protestors also stand and block cars as patients and employees attempt to enter the driveway or garage entrance to these facilities. Other times, protestors circle cars and put their faces against, or in close proximity to, the car windows to scream at and sometimes videotape people in their cars. In some cases, protestors throw anti-abortion literature and leaflets into people's cars as they enter or exit the facilities. Even more egregious are the protestors who dress as Boston Police Department officers and approach women and their companions at close distance, pretending that they are escorting them to the clinic's entrance, only to taunt them or force leaflets into their hands as they make their way to and from the healthcare facilities. All of these actions can and do easily spark reaction and response and create

---

Ex. 26) [# 63–4]. Attorney General Coakley, Mary Beth Heffernan, Undersecretary for Criminal Justice, and William Keating, Norfolk County District Attorney, also testified.

**62.** *See* Martignetti Aff. at 1 (Trial Ex. 24)[# 61].

**63.** *See, e.g.,* Hearing Transcript at 16 (Trial Ex. 26) [# 63–4].

**64.** *See* Compilation of Letters at 2–25 (Trial Ex. 17)[# 52].

an unsafe, dangerous risk along our public ways. The actions directly impede the normal flow of traffic along the Commonwealth's public ways and sidewalks and hinder women's ability to access reproductive healthcare.[65]

The Legislature also heard testimony from RHCF staff, volunteers and law enforcement personnel regarding specific incidents of patient harassment and intimidation in the areas immediately outside RHCF entrances and driveways. Additionally, the Legislature learned about protesters blocking access RHCFs by physically positioning themselves very close to RHCF entrances and driveways.[66] Examples included the following:

- One clinic volunteer at a Boston RHCF reported:

  The protestors are moving closer and closer to the main door. They scream and block the way for the patients to get into the clinic. We fill out police reports almost every week regarding the way they encroach upon the door, but nothing has changed.[67]

  They get very close to the patients and escorts inside the buffer zone. . . . [68]

  [T]hey're getting so close that patients are terrified to even walk into the clinic. I've had people ask me, isn't there a back way. . . . [69]

When it is raining, it is exceptionally bad. Many of the protestors are inside the buffer zone with very large umbrellas and have no regard for who they hit with them. I have often been swiped with the points on their umbrellas and have nearly fallen to avoid being hit.[70]

- The president of Planned Parenthood League of Massachusetts personally observed the following at the organization's Boston facility:
  - Protestors screaming at patients and employees inside the current 'buffer zone', usually right at the doorway. . . .
  - Protesters photographing and filming into patients and employees' cars and taking photos of license plate numbers to post on websites
  - Protesters standing in front of cars and the keypad to the garage to block access, so that they can throw pamphlets and other propaganda into cars entering the garage
  - And, most deceptively, I've seen protesters dress up wearing Boston Police T-shirts and hats, trying to collect patient contact information, videotaping, and in other ways trying to intimidate those who are simply exercising their legal right to seek confidential medical services [71]

---

65. Martha Coakley Written Testimony, Ex. D to Martignetti Aff. (Trial Ex. 24) [# 61–5] (spacing modified).

66. Indeed, Captain Evans testified:

A lot of people are under the misconception that [the law] prevents protestors from going into that buffer zone, which is incorrect. Protestors can stand up right in front of the door. A lot of them hold signs right there. As long as they stay stationary, you know, they can stand in front of that door. William Evans Oral Testimony, Hearing Transcript at 25 (Trial Ex. 26) [# 63–4].

67. Gail Kaplan Written Testimony, Ex. C to Martignetti Aff. (paragraph number omitted) (Trial Ex. 24) [# 61–4].

68. *Id.* (paragraph number omitted).

69. Gail Kaplan Oral Testimony, Hearing Transcript at 40 (Trial Ex. 26) [# 63–4].

70. Gail Kaplan Written Testimony, Ex. C to Martignetti Aff. (paragraph number omitted) (Trial Ex. 24) [# 61–4].

71. Diane Luby Written Testimony at 2, Ex. G to Martignetti Aff. (Trial Ex. 24) [# 61–8].

- A Planned Parenthood volunteer reported that protesters stood in front of the building's entrance, "every Saturday morning, every week."[72] She explained:

  There are several long-time protesters who appear in front of Planned Parenthood. . . .

  When women approach the building, protesters fan out and approach them.

  . . .

  The clear intent of the vast majority of protesters is to deter people from entering the building at all. The current buffer zone . . . does not permit protesters to 'approach' anyone without consent in the zone, but it does not speak to standing still in front of the building's entrance and thereby forcing patients to approach them.

  . . .

  Physical blocking is practiced regularly by protesters. They either stand in front of the door, in the middle of the sidewalk, or in front of car doors as cars pull up to the sidewalk. Some people pull up in cars and roll down their window to ask about the clinic's secure parking garage. If the protesters get to the car first, they have been repeatedly heard to tell people that the garage is closed, when it is not. They also shove pamphlets through the open window, regardless of the occupant's requests.

  In the rear of the building, near the clinic's garage entrance . . . . protesters often wait by the door and video tape the patients' cars' license plates.[73]

- At an Attleboro RHCF, a patient advocate reported:

[P]rotesters impede access to clinic doors, but also create safety issues for the general public trying to use sidewalks, streets or driveways.

. . .

[P]rotesters walk back and forth across the entrance of the driveway. . . . Though prohibited from standing in the entrance of the driveway, they frequently stop there until threatened with police action. There have been instances of picketers either slowing or speeding up to narrowly avoid being hit by cars driven by staff. Patients have reported feeling too intimidated by the pacing protesters to enter the property, and turning back.[74]

- At one RHCF, on a weekly basis, women try to drive to the facility but turn away "because they're afraid to enter the parking lot entranceway, [protesters] will block so as not to allow the car to come in, and then we have the other protestors dressed in paraphernalia who will come over to the window with a clipboard and ask them to please sign in before they come through the driveway."[75]

- Likewise, at one RHCF, "You can also see people circling in the same car around and around, and every time they pull up, you can see that they want to go out and they'll ask where is the garage and then they never stop."[76]

- A protester followed a woman into a Boston RHCF entranceway. At the same location, another protester ap-

72. Liz McMahon Written Testimony at 1, Ex. F to Martignetti Aff. (Trial Ex. 24) [# 61–7].

73. *Id.* at 1–2.

74. Melissa Conroy Written Testimony, Ex. B to Martignetti Aff. (Trial Ex. 24) [# 61–3].

75. Michael Baniukiewicz Oral Testimony, Hearing Transcript at 50–51 (Trial Ex. 26) [# 63–4].

76. Liz McMahon Oral Testimony, Hearing Transcript at 51 (Trial Ex. 26) [# 63–4].

proached and placed her head inside a car outside the clinic.[77]

- A protester wearing a "Boston Police" shirt, standing immediately next to a car trying to enter an RHCF garage.[78]
- Protestors "wearing police hats and police uniforms" as a way to get patients and others to consent to an approach.[79]

### 3. Law Enforcement's Position

The Legislature also received testimony about the difficulties of enforcing the 2000 Act.[80] The record demonstrates that these difficulties reduced the efficacy of the statute's intended protections, and were part of the reason that significant public safety concerns continued to exist at RHCFs. Attorney General Coakley explained:

> The current law provides no clearly defined boundary because it is a "floating" buffer zone within a defined radius of eighteen feet, so the buffer zone effectively moves and shifts as people pass along the public way to facility entrances or driveways. Either ignoring the law, or inadequately measuring the six-foot distance around a moving person, protestors routinely invade the existing buffer zone *in violation of the law.* This fact alone has made it very difficult if

not impossible for police to be able to immediately or ever determine whether a violation has occurred.

Another problem with the existing law is the inability to discern whether a patient, her companions, or facility employees have consented to a given protester's approach. Some protesters have said that they believed that a patient "consented" because of the way she made eye contact or because a patient uttered a statement in response to a protestor's comment (even if that statement was not one of consent).... Given the lack of a clearly defined buffer zone boundary, it has been very difficult, if not impossible, for police officers to monitor the distance these protestors maintain between themselves and the persons approaching the facilities and determine if there has been a violation; in other words, to enforce the law.[81]

Echoing Coakley's remarks, Massachusetts law enforcement personnel reported significant difficulties in enforcing the 2000 Act, and urged legislators to modify the law. Captain Evans reported, "This law, the way it stands, the current buffer zone with the 18–foot buffer zone, makes it very difficult for us to enforce the law."[82]

---

77. *See* Martha Coakley Oral Testimony, Hearing Transcript at 18–19 (Trial Ex. 26) [# 63–4].

78. William Evans Oral Testimony, Hearing Transcript at 36 (Trial Ex. 26) [# 63–4].

79. *Id.* at 35–37.

80. Plaintiffs argue that because a proposed amendment to Senate Bill 1353 did not make it into the final bill, "it appears the General Court rejected allegations that the [2000] Act was enforceable." Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 51. The proposed amendment was a line that stated, "The general court hereby finds that law enforcement officials have testified about practical problems related to the enforcement of [the 2000 Act]."

*Id.* (*citing* Mass. Senate Journal, Oct. 23, 2007). This argument is unpersuasive. The Legislature may not have adopted this amendment for a number of reasons, upon which this court will not speculate. Regardless, however, of why this line was not included, the Legislature heard and considered testimony regarding enforcement difficulties with the 2000 Act. The record also demonstrates that enforcement difficulties were related to the public safety problems.

81. Martha Coakley Written Testimony at 4–6, Ex. D to Martignetti Aff. (emphasis in original) (spacing modified) (Trial Ex. 24) [# 61–5].

82. William Evans Oral Testimony, Hearing Transcript at 25 (Trial Ex. 26) [# 63–4].

Mainly, the police had trouble determining whether a protester had "approached" a person within the six feet floating buffer, without that person's consent. Evans explained:

> What [the protesters] have to do is make an approach. Now what an approach is is very hard to determine; whether they stick out their hand, that's an approach; where they take a step forward, that's an approach. Basically, it turns us into basically something like—I like to make the reference of a basketball referee down there, where we're watching feet, we're watching hands.[83]

This "constant watching" proved difficult and created a public safety problem. At one of the RHCFs, for example, there have been "over 100 protestors every Saturday and a lot of them go right up in the faces of patients entering the premises."[84] Additionally, such surveillance was a significant "tying up of resources" that the police "had to deal with [for] seven years."[85]

Contrary to Plaintiffs' assertions at oral argument,[86] the police and district attorneys *tried* to prosecute violations of the 2000 Act. Evans indicated his frustration with trying to prosecute violations at one of the RHCF locations:

> We've trying [sic] everything, honestly. We've tried violation of the buffer zone, and we've brought a few cases up to Brighton Court and the court has basically not supported us....
>
> Chairman, we know all the players down there. We know the regular protesters.

We back up the stay-away orders and nothing seems to work down there.[87]

Evans noted that at one of the RHCFs, police had made "no more than five or so arrests."[88] The low number of arrests, however, was due to the difficulty of enforcing the law, not a lack of problematic conduct. Evans explained:

> Again, [it is] a very difficult law to enforce, what an approach is, what isn't. I mean, like I said, people can stand inside the buffer zone, and given the current set up of Planned Parenthood there, their door is in 10 feet of—actually, their buffer zone is really only 8 feet outside because of the setup.
>
> So it's such close quarters as it is there that everybody is in everybody's face, no matter what. So the buffer zone basically is no good, it really isn't, because just the proximity. It's almost like a goalie's crease out there....
>
> So given that fact, it makes it very difficult for us to say someone is violating it because they're allowed to stand outside the door, with the sign in their hand.[89]

In response to these problems, Captain Evans urged the Legislature to implement the 35-foot fixed buffer zone:

> Week in and week out, we are constantly receiving calls down there [at one of the facilities], both from protestors and from Planned Parenthood on violations. I think clearly having a fixed buffer zone, where everyone knows the rules and nobody can go in that and protest, will make our job so much easier. I think you've seen the video; you see what we

---

83. *Id.* at 25–56.

84. *Id.* at 26–27.

85. *Id.* at 26.

86. *See, e.g.,* Prelim. Bench Trial Transcript at 73.

87. William Evans Oral Testimony, Hearing Transcript at 34–35 (Trial Ex. 26) [# 63–4].

88. *Id.* at 33.

89. *Id.* at 33–34.

have to deal with. You know, it's a very difficult rule to enforce.

You know, there's the misconception that it's a fixed area where no protestors can go. That would be great. That would make our job so much easier. . . .

So I encourage the Committee and the legislators to support this bill. Not only will it safeguard the patients going in there, but it will also make the public safety official's job a lot easier. So I welcome the 35-foot buffer zone.[90]

With respect to the problem of protesters wearing police hats and uniforms, Evans noted:

[W]e've tried everything, and I think the only thing honestly that will keep these people out and the patients safe is to establish a fixed zone. That way there's no watching feet, watching hands and allowing protesters right up in their face.[91]

#### 4. First Amendment Concerns Articulated by Advocacy Groups

The Public Safety Committee also received testimony and correspondence from several organizations that voiced First Amendment concerns about the bill. For example, the American Civil Liberties Union of Massachusetts opposed the bill, mainly on overbreadth grounds.[92] Wendy Kaminer of the Defending Dissent Foundation expressed her "dismay about the effect of this bill on free speech."[93] Marie Sturgis of Massachusetts Citizens for Life, Inc. testified, "To increase the size of the existing area without substantial reason

would be an action that demonstrates unquestionable bias and clashes with First Amendment rights."[94] C.J. Doyle of the Catholic Action League of Massachusetts stated, "The proposed expansion of existing buffer zone legislation represents yet another effort to impose a content based restriction on freedom of speech, and to impair other constitutionally protected First Amendment activity such as freedom of religion and freedom of assembly."[95]

#### 5. Balancing First Amendment Concerns

The Legislature specifically acknowledged these First Amendment concerns, and took them into account. Indeed, at the May 16, 2007 Hearing, several legislators discussed the importance of balancing public safety considerations with the First Amendment rights of the protesters. Representative Marty Walz explained:

What we're seeking here is to amend the existing buffer zone law around healthcare clinics to establish a fixed buffer zone of only 35 feet, so much smaller than the 150 feet that we're accustomed to around polling places, and so for that 35 feet, we think that is an appropriate balance and one that strikes the right balance between First Amendment rights of protesters and the rights of women and other patients and family members and staff members to enter unimpeded into the healthcare clinics, so to recognize that there are competing rights and interests here, just as there are at polling places, and we think a 35-foot fixed buffer zone strikes the right

---

90. *Id.* at 26–27.

91. *Id.* at 35.

92. *See* Statement of the ACLU of Massachusetts (Trial Ex. 17)[# 52].

93. Wendy Kaminer Written Testimony at 1 (Trial Ex. 17)[# 52].

94. Marie Sturgis Written Testimony (Trial Ex. 17)[# 52].

95. Letter from C.J. Doyle, Catholic Action League to Committee, May 16, 2007 (Trial Ex. 17)[# 52].

balance to protect women entering and exiting the clinics.[96]

Similarly, Representative Michael Festa stated that the 2000 Act balanced the "First Amendment issues" with the concern "that without unfettered and reasonable access to these health services, that many women were being intimidated from having those services provided in an appropriate manner."[97] Addressing the 2007 Act, Representative Festa commented:

> I think this bill, quite frankly, strikes the balance in a way in 2007 that we can acknowledge, does give due respect for those who feel that they have need to express their objections to this whole situation, and at the same time, acknowledge that 35 feet is quite reasonable.... [T]his bill, I think, fundamentally does what needs to be done today, which is to give that protection and also afford the right to those who are concerned to express their views.[98]

The Legislature also specifically solicited and heard testimony on balancing these concerns. Senator Jarrett Barrios, the Committee's Chairman, stated:

> [S]ince I've got three of the finest lawyers in Massachusetts in front of me, and one of the leading arguments that is made in opposition to this is infringe-

ment on First Amendment rights which the federal government, and obviously there's a state equivalent to that.

. . .

> And I'm interested in your thoughts, if you have any, specifically as to why that's not the case.[99]

Attorney General Coakley responded that the law was a constitutional time, place and manner restriction that appropriately balanced patient rights, protester rights and public safety considerations.[100] Additionally, after recognizing the importance of First Amendment rights,[101] Coakley emphasized the balancing process: "There's always a balance involved" in First Amendment situations, "and I think it's an appropriate question and I think the Legislature has to weigh this."[102] Similarly, Keating noted, "I also view this in a Constitutional sense as a contest of competing freedoms...."[103] Heffernan agreed with Coakley and Keating, and briefly echoed their comments.[104]

### G. The 2007 Act

After receiving and considering this testimony, the Legislature enacted Senate Bill 1353 on November 8, 2007,[105] titled "An Act Relative to Reproductive Health Care Facilities ("Act or 2007 Act")," Chapter 155 of the Acts of 2007.[106] The Act contained an emergency preamble:

---

96. Marty Walz Oral Testimony, Hearing Transcript at 7 (Trial Ex. 26) [# 63–4].

97. Michael Festa Oral Testimony, Hearing Transcript at 11–12 (Trial Ex. 26) [# 63–4].

98. *Id.* at 12–13.

99. Jarrett Barrios Oral Testimony, Hearing Transcript at 29–30 (Trial Ex. 26) [# 63–4].

100. Martha Coakley Oral Testimony, Hearing Transcript at 30–32 (Trial Ex. 26) [# 63–4]. *See also* Martha Coakley Written Testimony at 6–7, Ex. D to Martignetti Aff. (discussing how the proposed bill protected First Amendment rights) (Trial Ex. 24) [# 61–5].

101. *Id.* at 30 ("I think all four of us take that right of the First Amendment extremely seriously....").

102. *Id.* at 30.

103. William Keating Oral Testimony, Hearing Transcript at 32 (Trial Ex. 26) [# 63–4].

104. *See* Mary Beth Heffernan Oral Testimony, Hearing Transcript at 32–33 (Trial Ex. 26) [# 63–4].

105. *See* Martignetti Aff. at 3 (Trial Exhibit 24)[# 61] ("Senate No. 1353 in its final form was passed by the Senate and the House on November 8, 2007.").

106. An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of

*Whereas,* The deferred operation of this act would tend to defeat its purpose, which is to increase forthwith public safety at reproductive health care facilities, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public safety.[107]

The Act itself read:

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same as follows:

SECTION 1. Section 120E 1/2 of chapter 266 of the General Laws, as appearing in the 2006 Official Edition, is hereby amended by inserting after the word "within", in line 2, the following words:– or upon the grounds of.

SECTION 2. Subsection (b) of said section 120E1/2 of said chapter 266, as so appearing, is hereby amended by striking out the first sentence and inserting in place thereof the following sentence:No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street

in front of such entrance, exit or driveway.[108]

The Act did not affect the 2000 Act's exemptions:

(1) persons entering or leaving such facility;

(2) employees or agents of such facility acting within the scope of their employment;

(3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.[109]

The Act also maintained the business hours and clearly marked restriction of the 2000 Act: "The provisions of subsection (b) shall only take effect during a facility's business hours and if the area contained within the radius and rectangle described in said subsection (b) is clearly marked and posted." [110]

Governor Patrick signed the bill on November 13, 2007.[111]

### H. Attorney General's Guidance on the 2007 Act

On January 25, 2008, the Attorney General's Office sent a letter to law enforcement personnel and RHCFs subject to the Act's coverage.[112] The letter summarized

---

the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E 1/2 (2007)) (emphasis in original) (Trial Ex. 1)[# 36].

**107.** *Id.* (emphasis in original).

**108.** *Id.*

**109.** Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(b) (2007) (spacing modified) (Trial Ex. 3)[# 38].

**110.** *Id.* § 120E 1/2(c) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(c) (2007) (Trial Ex. 3).

**111.** *See* An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E 1/2 (2007)) (Trial Ex. 1); Martignetti Aff. at 3 (Trial Ex. 24)[# 61].

**112.** *See* Narayanan Aff. at 1 (Trial Ex. 26)[# 63]; Letters from Maura T. Healey,

the Act, and emphasized that the Act's provisions were in effect only during an RHCF's business hours and only if the boundaries were "clearly marked and posted." [113] The letter also provided "guidance to assist you in applying the four exemptions" in the Act, which consisted of the following four paragraphs:

The first exemption—for persons entering or leaving the clinic—only allows people to cross through the buffer zone on their way to or from the clinic. It does not permit companions of clinic patients, or other people not within the scope of the second or third exemptions, to stand or remain in the buffer zone, whether to smoke, talk with others, or for any other purpose.

The second exemption—for employees or agents of the clinic acting within the scope of their employment—allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics, but does not allow them to express their views about abortion or to engage in any other partisan speech within the buffer zone.

Similarly, the third exemption—for municipal employees or agents acting within the scope of their employment—does not allow municipal agents to express their views about abortion or to engage in any other partisan speech within the buffer zone.

Finally, the fourth exemption—for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic—applies to individuals who are crossing through the buffer zone, without stopping, to go somewhere other than a location within the zone and other than the clinic, and who are not using the buffer zone for some other purpose while passing through. For example, an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech). [114]

The Attorney General's approach with respect to the second exemption directly tracks its approach to this exemption in the 2000 Act,[115] an approach approved by the First Circuit in *McGuire II*.[116]

Chief, Civil Rights Division, to the Boston and Brookline Police Departments, Ex. A to Narayanan Aff. (Trial Ex. 26) [# 63–2]; Letters from Maura T. Healey, Chief, Civil Rights Division, to Planned Parenthood League of Massachusetts and Women's Health Services, Ex. B to Narayanan Aff. (Trial Ex. 26) [# 63–3]. Aside from slight differences in the introductory paragraph, the letters are identical. Accordingly, this court will refer to the letter as the "2008 Guidance Letter."

113. 2008 Guidance Letter at 1–2 (Trial Ex. 26).

114. *Id.* at 2–3 (Trial Ex. 26).

115. In the 2003 Guidance Letter, the Attorney General emphasized that " '*all persons* in the restricted area, including clinic employees and agents, are subject to the restrictions in Section 120E 1/2(b) of the Act, including the restriction on oral protest, education, or counseling[,]' and that clinic employees and agents may not use the exemption to 'express their views about abortion[.]' " *McGuire v. Reilly*, 271 F.Supp.2d 335, 339–40 (D.Mass. 2003) (Harrington, J.), *aff'd, McGuire II*, 386 F.3d 45 (1st Cir.2004) (quoting 2003 Guidance Letter) (emphasis added).

116. *McGuire II*, 386 F.3d at 64 ("[W]e find the Attorney General's interpretation to be one very likely interpretation of the exemption's language ... [,]" and it "is important for our purposes ... because it is clearly a proper, content-neutral way of interpreting the exemption."). *See also supra* Factual Findings § E.

**Discussion: Legal Standard for Facial Challenge**

Three different standards may apply to Plaintiffs' facial challenge.[117]

In *United States v. Salerno*, the Supreme Court held that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." [118]

Second, although "some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.' " [119]

Lastly, in the First Amendment context, there is another "type of facial challenge ... under which a law may be overturned as impermissibly overbroad because a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.' " [120]

For the reasons below, the Act survives under all three standards.

**Discussion: First Amendment Challenge**

**A. First Amendment Doctrine**

The Free Speech Clause of the First Amendment states that "Congress shall make no law ... abridging the freedom of speech...." [121] This prohibition applies to the states by virtue of the Fourteenth Amendment.[122] As clarified by the First Circuit, "Notwithstanding its exalted position in the pantheon of fundamental freedoms, free speech always must be balanced against the state's responsibility to preserve and protect other important rights. This balance may be weighted differently, however, depending upon the nature of the restriction that the government seeks to foster." [123]

"The Supreme Court has articulated a framework for determining whether a particular regulation impermissibly infringes upon free speech rights. That framework dictates the level of judicial scrutiny that is due—and that choice, in turn, informs the nature of the restrictions on free speech that may be permissible in a public forum." [124]

---

117. *See, e.g., United States v. Carta*, 503 F.Supp.2d 405 (D.Mass.2007) (Tauro, J.) ("The precise test to apply to a facial challenge is not clear.").

118. 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). *See also Crawford v. Marion County Election Bd.*, —— U.S. ——, ——, 128 S.Ct. 1610, 1621, 170 L.Ed.2d 574 (2008) ("Given the fact that petitioners have advanced a broad attack on the constitutionality of [the statute], seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion."); *McGuire I*, 260 F.3d at 46–47 ("a party who mounts a facial challenge to a statute must carry a significantly heavier burden than one who seeks merely to sidetrack a particular application of the law.").

119. *Wash. State Grange v. Wash. State Republican Party*, —— U.S. ——, ——, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) (*quoting Washington v. Glucksberg*, 521 U.S. 702, 739–40, and n. 7, 117 S.Ct. 2258, 138 L.Ed.2d

772(1997) (Stevens, J., concurring in judgments)).

120. *Id.* at 1191 n. 6 (*citing New York v. Ferber*, 458 U.S. 747, 769–771, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) and *quoting Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

121. U.S. Const. Amend. I.

122. *See Knights of Columbus v. Town of Lexington*, 272 F.3d 25, 30–31 (1st Cir.2001) (*citing Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

123. *McGuire I*, 260 F.3d at 42. *See also Knights of Columbus*, 272 F.3d at 31 ("Despite the uncompromising language in which this proscription is couched, it is not absolute.").

124. *Knights of Columbus*, 272 F.3d at 31 (*citing McGuire I*, 260 F.3d at 42).

■ The appropriate level of scrutiny depends on whether a statute is content-based or content-neutral.[125] As a general rule, the government cannot impose content-based restrictions on speech.[126] Any such restriction is presumptively invalid, and must be evaluated under strict scrutiny.[127] A content-based law, therefore, will be upheld only if it is "absolutely necessary to serve a compelling state interest and is narrowly tailored to the achievement of that end." [128]

■ Instead of regulating the content of speech, content-neutral restrictions regulate the time, place and manner in which expression may occur. Content-neutral restrictions "are less threatening to freedom of speech because they tend to burden speech only incidentally, that is, for reasons unrelated to the speech's content or the speaker's viewpoint." [129] As a result, these restrictions are evaluated under the "intermediate" level of scrutiny, and will be upheld if (1) "they are justified without reference to the content of the regulated speech;" (2) "are narrowly tailored to serve a significant governmental interest;" and (3) "leave open ample alternative channels for communication of the information." [130]

## B. Content–Based versus Content–Neutral

Plaintiffs argue that the Act constitutes an impermissible content-based restriction on speech. This argument takes two forms. First, Plaintiffs, albeit briefly, urge this court to find that the statute itself is a content-based restriction.[131] Second, in their Complaint, Plaintiffs bring a viewpoint discrimination count,[132] and "courts correctly regard viewpoint discrimination as a particularly pernicious form of content discrimination . . . ." [133]

Alternatively, Plaintiffs argue that the Act is an impermissible time, place and manner regulation.[134]

■ Defendant argues that the act is content-neutral and validly regulates the time, place and manner of expressive activity. This court agrees.

### 1. No Subject Matter Restriction

■ "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." [135] Accordingly, "a law designed to serve purposes unrelated to the content of protected speech is deemed content-neu-

**125.** *Naser Jewelers, Inc. v. City of Concord,* 513 F.3d 27, 32 (1st Cir.2008) ("A threshold question in cases involving challenges to government restrictions on speech is whether the restriction at issue is content-neutral or, to the contrary, is content-based.").

**126.** *McGuire I,* 260 F.3d at 42 (*citing Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 641–42, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

**127.** *Id.* at 43 (*citing R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 736 (1st Cir.1995)).

**128.** *Id.* (*citing,* as examples, *Boos v. Barry,* 485 U.S. 312, 321–29, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *Ark. Writers' Project, Inc.*

*v. Ragland,* 481 U.S. 221, 231–32, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987)).

**129.** *Id.*

**130.** *Id.* (*quoting Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

**131.** *See, e.g.,* Pls.' Proposed Findings of Fact and Conclusions of Law at 27 ("PFF") [# 69].

**132.** Compl. at 18–19.

**133.** *McGuire I,* 260 F.3d at 48.

**134.** *See* Compl. at 15; PFF at 27–32.

**135.** *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989). *See also Hill v. Colorado,* 530

tral even if, incidentally, it has an adverse effect on certain messages while leaving others untouched."[136]

Here, as with the 2000 Act, "[b]y addressing political speech on public streets and sidewalks, the Act plainly operates at the core of the First Amendment."[137] But "First Amendment interests nonetheless must be harmonized with the state's need to exercise its traditional police powers."[138] As the First Circuit did in *McGuire I*, for the following reasons, this court "resolve[s] this balance" in favor of the Commonwealth.[139]

As noted above, in *Hill v. Colorado*, the Supreme Court considered a Colorado statute that also regulated conduct around reproductive health care facilities.[140] The Court held that the statute was content-neutral for "three independent reasons."[141]

First, it is not a "regulation of speech." Rather, it is a regulation of the places where some speech may occur.

Second, it was not adopted "because of disagreement with the message it conveys." This conclusion is supported not just by the Colorado courts' interpretation of legislative history, but more importantly by the State Supreme Court's unequivocal holding that the statute's "restrictions apply equally to all demon-

strators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech."

Third, the State's interests in protecting access and privacy, and providing the police with clear guidelines, are unrelated to the content of the demonstrators' speech. As we have repeatedly explained, government regulation of expressive activity is "content neutral" if it is justified without reference to the content of regulated speech. . . .[142]

Here, the 2007 Act is content-neutral for the same three reasons. First, the statute does not directly regulate speech. Indeed, it does not mention speech or expression at all, much less prohibit certain types of messages, statements, literature or signage.[143] Instead, and permissibly, "it merely regulates the places *where* communications may occur."[144] Moreover, the statute continues to apply during an RHCF's business hours only, and only if the buffer zone is clearly delineated.[145]

Second, the record clearly demonstrates that the Legislature did not adopt the 2007 Act "because of disagreement with the message it conveys."[146] The Legislature amended the 2000 Act to address continued and serious public safety problems in the areas adjacent to RHCF entrances and

---

U.S. 703, 719, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (*citing Ward*); *Naser Jewelers, Inc.*, 513 F.3d at 32; *McGuire I*, 260 F.3d at 43.

**136.** *McGuire I*, 260 F.3d at 43 (*citing Hill*, 530 U.S. at 736, 120 S.Ct. 2480; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)).

**137.** *Id.* at 43 (*citing Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)).

**138.** *Id.* at 44 (*citing Hill*, 530 U.S. at 714–15, 120 S.Ct. 2480).

**139.** *Id.*

**140.** 530 U.S. at 707, 120 S.Ct. 2480.

**141.** *Id.* at 719, 120 S.Ct. 2480.

**142.** *Id.* at 719–720, 120 S.Ct. 2480 (footnote omitted and spacing modified).

**143.** *See id.* at 731, 120 S.Ct. 2480 ("As we have already noted, [the statute] simply does not 'ban' any messages, and likewise it does not 'ban' any signs, literature, or oral statements.").

**144.** *Id.* (emphasis added).

**145.** *See* Mass. Gen. Laws ch. 266 § 120E 1/2(c) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(c) (2007) (Trial Ex. 3); 2008 Guidance Letter at 1–2 (Trial Ex. 26).

**146.** *Ward*, 491 U.S. at 791, 109 S.Ct. 2746.

driveways, including significant concerns regarding safe patient access to medical services. Relatedly, serious enforcement difficulties with the 2000 Act limited its intended protections and were part of the reason that major public safety concerns continued to exist at RHCFs.

These reasons are entirely "unrelated to disagreement with the underlying message of particular speech."[147] Moreover, as with the 2000 Act, the 2007 Act's "restrictions apply equally to *all demonstrators, regardless of viewpoint,* and the statutory language makes no reference to the content of the speech."[148] Indeed, this "comprehensiveness ... is a virtue ... because it is evidence against there being a discriminatory governmental motive."[149]

Third, as in *Hill,* the statute "advances interests unconnected to expressive content."[150] "As [the Court has] repeatedly explained, government regulation of expressive activity is 'content neutral' if it is justified without reference to the content of regulated speech."[151]

Here, as was the case with the 2000 Act, "[t]he Massachusetts legislature, confronted with an apparently serious public safety problem, investigated the matter thoroughly."[152] As described above, the investigation demonstrated that there was still a significant public safety and patient access problem in the areas immediately adjacent to RHCF entrances and driveways. Moreover, major enforcement difficulties with the 2000 Act allowed the problems to persist. Accordingly, as in *McGuire I,* the

Act is justified by "conventional objectives of the state's police power—promoting public health, preserving personal security, and affording safe access to medical services," without *any* reference to content.[153]

Focusing on this third reason, the First Circuit explained:

> The critical question in determining content neutrality is not whether certain speakers are disproportionately burdened, but, rather, whether the reason for the differential treatment is—or is not—content-based.... As long as a regulation serves a legitimate purpose unrelated to expressive content, it is deemed content-neutral even if it has an incidental effect on some speakers and not others.... In that event, all that remains is for the government to show that accomplishment of the legitimate purpose that prompted the law also rationally explains its differential impact.[154]

Here, as in *McGuire I,* the Act's goals "justify its specific application to RHCFs."[155] Additionally, "[a]lthough the Act clearly affects anti-abortion protesters more than other groups, there is no principled basis for assuming that this differential treatment results from a fundamental disagreement with the content of their expression."[156] As in *McGuire I,*

> [T]he finding required on these facts is that the legislature was making every effort to restrict as little speech as possible while combating the deleterious secondary effects of anti-abortion protests.

147. *McGuire I,* 260 F.3d at 44.

148. *Hill,* 530 U.S. at 719, 120 S.Ct. 2480 (emphasis added).

149. *Id.* at 731, 120 S.Ct. 2480.

150. *McGuire I,* 260 F.3d at 44 (*citing Hill,* 530 U.S. at 719, 120 S.Ct. 2480).

151. *Hill,* 530 U.S. at 720, 120 S.Ct. 2480.

152. *McGuire I,* 260 F.3d at 44.

153. *Id.*

154. *Id.* (citations omitted).

155. *Id.*

156. *Id.*

Just as targeting medical centers did not render Colorado's counterpart statute content based, ... so too the Act's targeting of RHCFs fails to undermine its status as a content neutral regulation.[157]

Plaintiffs, however, as the plaintiffs did in *McGuire I*, imply that the Legislature's reasons for amending the Act were pretextual.[158] Additionally, Plaintiffs argue:

[I]t is only abortion providers and supporters that talk about all these problems that are around the clinics. And they don't do it with respect to facts. They make conclusory allegations.

. . .

These people would be expected to embellish their testimony because they side with the pro choice viewpoint as opposed to those who oppose abortion.

But when we look at the objective unbiased evidence in the record, there is nothing that supports the zone. The police didn't testify that there was any problem outside the abortion clinics. They didn't say that there was any impeding, any blocking, any harassment, any trespass.[159]

Plaintiffs' arguments fail for two reasons. First, with respect to the Legislature's reasons for amending the statute, Plaintiffs' "insinuations are unsupported by any record evidence."[160] Moreover, "where differential treatment is justified, on an objective basis, by the government's content-neutral effort to combat secondary effects, it is insufficient that a regulation may have been adopted in direct response to the negative impact of a particular form of speech."[161]

Second, despite Plaintiffs' claims regarding the evidence before the Legislature, the record is replete with factual references to specific incidents and patterns of problematic behavior around RHCFs. Additionally, nothing in the record suggests that the individuals who testified—under oath—before the Legislature, embellished or were in any way untruthful.

Lastly, although Plaintiffs claim abortion providers and supporters were the only individuals who identified problems, Captain Evans of the Boston Police Department testified with respect to public safety problems outside of the RHCFs and the difficulties with enforcing the 2000 Act. Attorney General Coakley testified regarding the same.

## 2. Count V. Viewpoint Discrimination[162]

■ Plaintiffs also argue that the statute constitutes unlawful viewpoint discrimination, because "[t]he fixed buffer statute unjustifiably treats the conduct of the facility employees/agents differently from all other speakers, and the different treatment of conduct results in favor toward pro-choice speakers and disfavor toward all other speakers."[163] Plaintiffs base this claim on the employee/agent exemption in the Act, which exempts from the Act's coverage "employees or agents of such facility acting within the scope of their employment."[164]

157. *Id.*

158. *See, e.g.,* Prelim. Bench Trial Transcript at 70–71 ("Mr. DePrimo: Well, that's what they claim their purpose is.").

159. *Id.* at 72–73 (spacing modified).

160. *McGuire I*, 260 F.3d at 45.

161. *Id.*

162. This Memorandum addresses Plaintiffs' counts by topic, not by their order in the Complaint.

163. PFF at 40.

164. Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(b) (2007) (Trial Ex. 3).

This count also fails. First, it is important to note that the Act did not modify any of the exemptions previously established by the 2000 Act, including the employee/agent exemption. Furthermore, the First Circuit specifically addressed and upheld this exemption in *McGuire I* and *McGuire II*, holding that it was content-neutral and did not constitute viewpoint discrimination.[165] Nothing in this case warrants a departure from that analysis and holding.

In *McGuire I*, the plaintiffs' argument suggested that "the sole practical purpose of the employee exemption is to promote a particular side of the abortion debate."[166] In response, the court held, among other things,

> The Massachusetts legislature may or may not have intended the employee exemption to serve the purpose envisioned by the plaintiffs. There are other likely explanations. For example, the legislature may have exempted clinic workers—just as it exempted police officers—in order to make crystal clear what already was implicit in the Act: that those who work to secure peaceful access to RHCFs need not fear prosecution.[167]
>
> . . .
>
> Because we can envision at least one legitimate reason for including the employee exemption in the Act, it would be premature to declare the Act unconstitutional for all purposes and in all applications.[168]

The First Circuit concluded, "The employee exemption ... is neutral on its face, drawing no distinction between different ideologies. And to the extent (if at all) that the exemption contributes to the Act's disproportionate impact on anti-abortion protesters, it can be justified by reference to the state's neutral legislative goals."[169]

Similarly, in *McGuire II*, the court held:

> As we explained in *McGuire I*, so long as a reviewing court can "envision at least one legitimate reason for including the employee exemption in the Act," the law is not facially unconstitutional. *McGuire I*, 260 F.3d at 47. In *McGuire I* this court found there were likely explanations for the exemption other than the desire to favor pro-abortion speech over anti-abortion speech: "For example, the legislature may have exempted clinic workers—just as it exempted police officers—in order to make crystal clear ... that those who work to secure peaceful access to RHCFs need not fear prosecution." *Id.* at 47. For this reason given in *McGuire I*, the viewpoint facial attack fails, now as then.[170]

Plaintiffs try to distinguish *McGuire I* and *McGuire II* on the ground that "[t]he rationale employed to uphold the employee/agent exemption of the floating buffer statute does not apply to the fixed buffer zone statute...."[171] Plaintiffs argue:

> Unlike the fixed buffer statute, the floating buffer statute permitted all persons to access any part of the zone so long as they did not make unconsented to ap-

---

165. *See McGuire I*, 260 F.3d at 46–48; *McGuire II*, 386 F.3d at 58.

166. *McGuire I*, 260 F.3d at 46.

167. *Id.* at 47.

168. *Id.*

169. *Id.* at 48.

170. *McGuire II*, 386 F.3d at 58.

171. PFF at 41. Plaintiffs make this argument as part of their equal protection count, but because it directly implicates the employee/agent exemption, this court addresses it here. The equal protection count fails for independent reasons discussed below.

proaches from a distance of 6 feet or less, creating a possibility that the zone could become crowded and therefore make navigation by clinic patients difficult.... The same is not true of the fixed buffer statute. Because pro-life advocates and virtually all other persons are excluded from the zone, patients have unhindered and safe passage through the zone to the clinics.[172]

This argument fails for several reasons. First, contrary to Plaintiffs' contention, the rationale advanced in *McGuire I* continues to apply. In *McGuire I*, the court held that the employee exemption served the goals of the 2000 Act "because clinic employees often assist in protecting patients and ensuring their safe passage as they approach RHCFs."[173] As the record reflects, the same is true today. Accordingly, "[s]ince it is within the scope of their employment for clinic personnel to escort patients in this fashion, and since a primary purpose of the law is to facilitate safe access, the employee exemption serves the basic objectives of the Act."[174]

Additionally, "[t]o cinch matters, the legislature could have concluded that clinic employees are less likely to engage in directing of unwanted speech toward captive listeners—a datum that the *Hill* court recognized as justifying the statute there."[175] As with the 2000 Act, the legislature likely concluded the same thing here when deciding to maintain the exemption.

Second, even assuming that the rationale applies with less weight here than with the 2000 Act—contrary to the position of this court—as long as there is "one legitimate reason for including the employee exemption in the Act," the law is not facially unconstitutional.[176] In addressing the identical employee/agent exemption, the *McGuire I* court found "other likely explanations for the exemption," and gave the example cited twice above. The same example applies here: "the legislature may have exempted clinic workers—just as it exempted police officers—in order to make crystal clear ... that those who work to secure peaceful access to RHCFs need not fear prosecution."[177] Accordingly, there is "at least one legitimate reason for including the employee exemption in the Act, [and] it would be premature to declare the Act unconstitutional for all purposes and in all applications."[178]

Plaintiffs also argue, "Whether or not by design, the fixed buffer statute allows escorts with pro-choice viewpoints to express their views in the zone while prohibiting most other persons from expressing their views in the zone."[179]

This argument also fails, at least on this facial challenge.[180] On its face, the statute

---

172. *Id.*

173. *McGuire I*, 260 F.3d at 46.

174. *Id.*

175. *Id.*

176. *Id.* at 47; *McGuire II*, 386 F.3d at 58 (*citing McGuire I*, 260 F.3d at 47). As noted above, the First Circuit emphasized this point in both *McGuire* cases.

177. *McGuire I*, 260 F.3d at 47; *McGuire II*, 386 F.3d at 58 (*citing McGuire I*, 260 F.3d at 47). *See also McGuire I*, 260 F.3d at 46

(Holding that "testimony taken before the state senate indicates beyond cavil that the employee exemption will promote the Act's goals because clinic employees often assist in protecting patients and ensuring their safe passage as they approach RHCFs.").

178. *McGuire I*, 260 F.3d at 47.

179. PFF at 41.

180. If "experience shows that clinic staffers in fact are utilizing the exemption as a means either of proselytizing or of engaging in preferential pro-choice advocacy ... [,]" Plaintiffs may present this argument during the as-applied challenge. *McGuire I*, 260 F.3d at 47.

does not permit advocacy of any kind in the zone. Moreover, the Attorney General's enforcement position expressly and unequivocally prohibits any advocacy by employees and agents of the RHCF's in the buffer zone: [181]

> The second exemption—for employees or agents of the clinic acting within the scope of their employment—allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics, but does not allow them to express their views about abortion or to engage in any other partisan speech within the buffer zone.[182]

This approach is consistent with the Attorney General's past interpretation of the exemption,[183] an approach the District Court and the First Circuit cited with approval in *McGuire II*.[184] As with the 2000 Act, the Attorney General's current position "require[s] evenhanded enforcement of its prohibitions, even against clinic employees and agents...."[185] It is "one very likely interpretation of the exemption's language," and "is clearly a proper, content-neutral way of interpreting the exemption." [186]

For these reasons, the employee exemption does not discriminate based on view-

point, and Count V of Plaintiffs' Complaint fails.

### 3. Conclusion Regarding Content Neutrality

On its face, the 2007 Act is a content-neutral time, place and manner restriction, and the employee exemption does not constitute viewpoint discrimination. Accordingly, this court evaluates the Act using intermediate scrutiny.

### C. Count I. Time, Place and Manner Restriction

■ Time, place and manner regulations will be upheld if (1) "they are justified without reference to the content of the regulated speech;" (2) "are narrowly tailored to serve a significant governmental interest;" and (3) "leave open ample alternative channels for communication of the information." [187] Here, the Act meets all three prongs of the test.

### 1. Justified Without Reference to Content of Regulated Speech

As explained above, the statute is justified without any reference to the content of regulated speech. The Act's purpose is "to increase forthwith public safety at reproductive healthcare facilities," [188] by pro-

---

**181.** Although this is a facial challenge, this court may properly consider the Attorney General's enforcement position. *See Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.") (*citing Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). *See also Ward v. Rock Against Racism,* 491 U.S. 781, 795–96, 109 S.Ct. 2746, 2756, 105 L.Ed.2d 661 (1989) (*quoting Hoffman Estates,* 455 U.S. at 494 n. 5, 102 S.Ct. 1186).

**182.** 2008 Guidance Letter at 2 (Trial Ex. 26).

**183.** *See supra* Factual Findings § D.

**184.** *See McGuire II,* 386 F.3d at 65–66; *McGuire v. Reilly,* 271 F.Supp.2d 335, 341 (D.Mass.2003). See also *supra* Factual Findings § E.

**185.** *McGuire v. Reilly,* 271 F.Supp.2d at 341.

**186.** *McGuire II,* 386 F.3d at 64.

**187.** *McGuire I,* 260 F.3d at 43 (*quoting Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

**188.** An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E 1/2 (2007)). (Trial Ex. 1)[# 36].

tecting public safety in the areas adjacent to RHCF entrances and driveways, and ensuring safe patient access to medical services.[189] "The interests that underlie these purposes are firmly rooted in the state's traditional police powers, and these are precisely the sort of interests that justify some incidental burdening of First Amendment rights."[190]

## 2. Narrowly Tailored

The Supreme Court has repeatedly held that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so."[191] Instead, a law is narrowly tailored if it " 'promotes a substantial government interest that would be achieved less effectively absent the regulation,' "[192] and "does so without burdening substantially more speech than is necessary to further this goal."[193]

As long as this test is satisfied, a "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."[194] "Put another way, the validity of time, place, or manner regulations is not subject to 'a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.' "[195]

Lastly, this court "must, of course, take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary."[196] "States and municipalities plainly have a substantial interest in controlling the activity around certain public and private places," and the Supreme Court has recognized "the unique concerns that surround health care facilities...."[197]

---

**189.** The Commonwealth's public safety goal is furthered by the statute's attempt to eliminate the enforcement difficulties with the 2000 Act's floating zone. As noted, these difficulties limited the 2000 Act's intended protections and were part of the reason that major public safety concerns persisted at RHCFs.

**190.** *McGuire I,* 260 F.3d at 48 (*citing Hill,* 530 U.S. at 715, 120 S.Ct. 2480 (noting the "enduring importance of the right to be free from persistent importunity, following and dogging after an offer to communicate has been declined") (citation and internal quotation marks omitted)); *Schenck v. Pro–Choice Network,* 519 U.S. 357, 376, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (extolling the significance of "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services"); *Madsen v. Women's Health Center, Inc.,* 512 U.S. 753, 772–73, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) ("The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests.").

**191.** *Ward,* 491 U.S. at 798, 109 S.Ct. 2746.

**192.** *Id.* at 799, 109 S.Ct. 2746 (*quoting U.S. v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)).

**193.** *McGuire I,* 260 F.3d at 48 (*citing Ward,* 491 U.S. at 799, 109 S.Ct. 2746). See also *Naser Jewelers, Inc. v. City of Concord,* 513 F.3d 27, 30 (1st Cir.2008) (*citing Ward,* 491 U.S. at 799, 109 S.Ct. 2746).

**194.** *Ward,* 491 U.S. at 800, 109 S.Ct. 2746; *Naser,* 513 F.3d at 35 (*citing Ward,* 491 U.S. at 800, 109 S.Ct. 2746).

**195.** *Bl(a)ck Tea Society v. City of Boston,* 378 F.3d 8, 12 (1st Cir.2004) (*citing Ward,* 491 U.S. at 800, 109 S.Ct. 2746) (internal citations and quotation marks omitted).

**196.** *Hill,* 530 U.S. at 728, 120 S.Ct. 2480 (*quoting Madsen,* 512 U.S. at 772, 114 S.Ct. 2516).

**197.** *Id.*

Here, the Commonwealth has a substantial and legitimate content-neutral interest in protecting public safety at RHCF entrances and driveways, because "[i]t is a traditional exercise of the States' police powers to protect the health and safety of their citizens." [198] The Commonwealth also has a legitimate, content-neutral interest in providing "unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests." [199] Indeed, Plaintiffs appear to acknowledge the importance of this interest: "[I]t appears the fixed buffer statute was designed to protect the health and safety of women seeking reproductive health care services. This is a legitimate interest." [200] Additionally, at the Bench Trial, Plaintiffs noted: "In this particular case the legitimate sweep is what? It is clearing out the bottleneck ... immediately adjacent to the doors and to the driveways. Certainly blocking, impeding, trespass is actually a significant interest. That's a legitimate interest of the government." [201]

Having found qualifying governmental interests, this court now determines that the law is narrowly tailored to serve those interests. Despite the passage of the 2000 Act, the Commonwealth faced significant public safety problems in the areas adja-

cent to RHCF entrances and driveways, including serious concerns regarding safe patient access to medical services. As a result, following an investigation, the Legislature reasonably concluded that the 2000 Act's floating buffer zone was insufficient, [202] and determined that a 35–foot fixed buffer zone was immediately necessary to protect public safety and ensure patient access to clinics. Accordingly, based on the record before the Legislature and the record before this court, promoting these public safety interests would be achieved less effectively without the fixed-buffer zone law.

Additionally, the law does not burden substantially more speech than necessary to further these public safety goals. Again, "the government is not required to choose the least restrictive approach in content-neutral regulation." [203] Here, the Legislature appears to have carefully considered and balanced the Act's effects on speech with the Commonwealth's legitimate governmental interests. The result was a 35–foot fixed buffer zone that targeted the problematic areas (areas immediately adjacent to RHCF entrances and driveways), during the problematic times (an RHCF's business hours).

Furthermore, the Supreme Court and other federal courts have upheld several

**198.** *Hill,* 530 U.S. at 715, 120 S.Ct. 2480 (internal citations and quotation marks omitted).

**199.** *Id.* (*citing Madsen,* 512 U.S. 753, 114 S.Ct. 2516; *NLRB v. Baptist Hospital, Inc.,* 442 U.S. 773, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979)). *See also id.* at 728, 120 S.Ct. 2480 ("Persons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions. The State of Colorado has responded to its substantial and legitimate interest in protecting these persons from unwanted encounters, confrontations, and even assaults by enacting an exceedingly

modest restriction on the speakers' ability to approach.").

**200.** PFF at 34 (*citing McGuire I,* 260 F.3d at 44).

**201.** Prelim. Bench Trial Transcript at 76.

**202.** *See, e.g., McGuire I,* 260 F.3d at 49 (holding that "[t]he Massachusetts legislature reasonably concluded that *existing law inadequately addressed* the public safety, personal security, traffic, and health care concerns created by persistent demonstrations outside RHCFs.") (emphasis added).

**203.** *Naser,* 513 F.3d at 36.

fixed zones as "narrowly tailored" under the First Amendment. For example, in *Madsen*, the Court upheld part of an injunction that created a 36–foot fixed buffer zone around an RHCF's entrances and driveway.[204] Also, in *Schenck*, the Court upheld an injunction that created a 15–foot fixed buffer zone around RHCF entrances, doorways and driveways.[205]

On the record before this court, like in *Schenck*, this court finds that the fixed buffer zone is "necessary to ensure that people and vehicles trying to enter or exit the clinic property or clinic parking lots can do so,"[206] which directly furthers the public safety and access goals of the Commonwealth. As in *Madsen* and *Schenck*, "the record shows that protesters purposefully or effectively blocked or hindered people from entering and exiting the clinic doorways, from driving up to and away from clinic entrances, and from driving in and out of clinic parking lots."[207] As such, the Legislature "was entitled to conclude that the only way to ensure access was to move back the demonstrations away from the driveways and parking lot entrances," and "the only way to ensure access was to move *all* protesters away from the doorways."[208]

Lastly, the exact size of the buffer zone is not a choice for this court to make.[209] Maybe the Legislature's concerns warranted a slightly larger buffer zone, or maybe the Legislature could have accomplished its objectives with a slightly smaller zone. It is the view of this court, however, considering all of the evidence before the Legislature and this court, the Legislature's choice of 35 feet was a reasonable one under the circumstances, and one that was narrowly tailored to promoted the Commonwealth's substantial and legitimate interests.

**i. Note: Plaintiffs' Challenges to Legislature's Evidence**

Plaintiffs argue that the Legislature based the 2007 Act on outdated evidence that preceded the passage of the 2000 Act.[210] This argument carries no weight.

First, virtually all of the evidence presented to the Legislature in 2007 addressed the public safety situation in the years *following* the enactment of the 2000 Act, including information from the then-recent past. This cannot be considered stale by any means.

**204.** *See Madsen*, 512 U.S. 753, 114 S.Ct. 2516. The Court invalidated other aspects of the injunction, including the 36–foot buffer zone as applied to certain private property surrounding the clinic. *See id.* at 776, 114 S.Ct. 2516.

**205.** *See Schenck v. Pro–Choice Network of Western N.Y.*, 519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997).

**206.** *Id.* at 380, 117 S.Ct. 855.

**207.** *Id.*

**208.** *Id.* at 380–381, 117 S.Ct. 855 (emphasis in original). Similarly, as this court noted at the Bench Trial, "the government has the right to neutralize a certain amount of property." Prelim. Bench Trial Transcript at 79.

**209.** Again, "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Ward*, 491 U.S. at 800, 109 S.Ct. 2746 (internal citations and quotation marks omitted). Additionally, "Courts owe legislative judgments substantial respect and, as a general matter, should be reluctant " 'to reduce statutory language to a merely illustrative function.' " " *McGuire I*, 260 F.3d at 47 (*quoting Mass. Ass'n of HMO v. Ruthardt*, 194 F.3d 176, 181 (1st Cir.1999)).

**210.** *See, e.g.*, Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 48 (characterizing the evidentiary record as "stale").

Second, based on the record before this court, the post–2000 Act evidence formed the primary basis for the Legislature's adoption of the 2007 Act.

Third, the Legislature may certainly "make use of past experience," as long as "the degree to which inferences drawn from past experience are plausible." [211] Here, to the extent the Legislature considered the Commonwealth's history of public safety problems at RHCFs, it was reasonable to do so, particularly because the "past experience" derived from a relatively recent time frame. Indeed, this would be expected prior to the passage of most public safety laws. Additionally, it was plausible and reasonable for the Legislature to infer from past experiences at RHCFs that these problems would continue unless the 2000 Act was passed.

Plaintiffs also argue that nothing in the record supports creation of the fixed zone. According to Plaintiffs: "There is no evidence that anything happened between 2000 and 2007 that warranted the increase in the size of the buffer zone or even the fixed buffer zone but for the fact that the police were having difficulty in enforcing it. That's it." [212] Similarly, Plaintiffs claim:

> The police didn't testify that there was any problem outside the abortion clinics. They didn't say there was impeding, any blocking, any harassment, any trespass. The police are there all the time. That's the testimony in the record. They're there all the time and they didn't see any of the problems that these abortion providers and supporters saw.

Nothing in the record with respect [to] arrests and convictions.

. . .

Well, if these things are happening, Judge, why aren't the people who were actually violating the law being prosecuted? And if they're being prosecuted, why are there no convictions? There are no arrests and no convictions in the record with respect to unlawful conduct.

. . .

My point is is the lack of arrests and the law of convictions are showing that the illegal unlawful behavior isn't occurring in the first place. [213]

These arguments echo Plaintiffs' claims in the "content-based" versus "content-neutral" debate, and the response is the same. Contrary to Plaintiffs' contentions, the record contains numerous and specific factual references to continued public safety problems around RHCFs in the years following the passage of the 2000 Act, including impeded access, blocking and harassment. All of this evidence went well beyond difficulties in enforcing the 2000 Act.

Furthermore, although Plaintiffs claim that only RHCF employees and supporters identified problems, Captain Evans of the Boston Police Department testified about public safety problems outside of the RHCFs. Attorney General Coakley also testified. Moreover, nothing in the record supports Plaintiffs' implication that RHCF employees and supporters embellished or fabricated their testimony.

Additionally, as explained above, police and district attorneys *tried* to prosecute

---

**211.** *Bl(a)ck Tea Society v. City of Boston,* 378 F.3d 8, 14 (1st Cir.2004). Indeed, Plaintiffs acknowledged this at the Bench Trial. *See* Prelim. Bench Trial Transcript at 38 ("In *Bl(a)ck Tea Society* the First Circuit said that the government can consider past experiences but, I mean, there has to be a fairly reason-

able nexus, a plausible nexus between what happened in the past and what's happened in the future.").

**212.** Prelim. Bench Trial Transcript at 39.

**213.** *Id.* at 73–74 (spacing modified).

violations of the 2000 Act, but encountered significant difficulty; and the low number of arrests for violations was due to the difficulty of enforcing the law, not a lack of problematic conduct.

Lastly, although the 2007 Act mainly—if not entirely—responds to an existing public safety and law enforcement problem, the Legislature may certainly take a preventative approach to lawmaking. Indeed, in this case, "[a] bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself." [214]

### ii. Note: Plaintiffs' Conduct

Plaintiffs note that their conduct at RHCFs is peaceful, and that they do not block, impede or harass patients or pedestrians.[215] If this case involved an injunction directed at Plaintiffs, the lawfulness and character of their behavior would be important. At this time, however, this court is evaluating a facial challenge to a statute of general application. Accordingly, Plaintiffs' specific conduct is largely, if not entirely, irrelevant to the present analysis.[216]

### 3. Ample Alternative Channels

### i. Alternative Channels

The law also satisfies the final requirement, because it leaves open ample alternative avenues of communication.[217] First, there are important prerequisites for the Act to apply at a particular RHCF: the buffer zone must be clearly marked and posted, and is only enforceable during the normal business hours of the clinic.[218] Additionally, when in effect, the Act only applies within 35-foot radii of RHCF entrances and driveways, not around the entire property line.[219]

Furthermore, as long as Plaintiffs—or anyone for that matter—remain outside the zone, they may freely talk to individuals entering and exiting the RHCFs, as well as people inside the zone. The Act also does nothing to prevent patients from leaving the zone to speak with protesters or counselors. Moreover, individuals may continue to display signs and photographs, hand out literature, talk, pray, chant, sing or engage in any other form of lawful communication or protest outside of the buffer zone. Importantly, most, if not all of this expressive activity, can be seen and heard by people entering and exiting the buffer zone, and also by people inside the buffer zone.[220]

---

**214.** *Hill,* 530 U.S. at 729, 120 S.Ct. 2480.

**215.** *See, e.g.,* Decl. of Eleanor McCullen at 2, 4 (Trial Ex. 4); Decl. of Jean Blackburn Zarrella at 2–3 (Trial Ex. 5); Decl. of Carmel Ferrell at 2–3 (Trial Ex. 6); Decl. of Eric Cadin at 2–3 (Trial Ex. 7); PFF at 3–4.

**216.** Moreover, this court does not have a complete record on such conduct.

**217.** Plaintiffs may try to establish otherwise during their as-applied challenge, but this court cannot make such a finding on this facial challenge.

**218.** Mass. Gen. Laws ch. 266, § 120E 1/2(2)(c) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(c) (2007) (Trial Ex. 3).

**219.** An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E1/2 (2007)) (emphasis in original) (Trial Ex. 1)[# 36].

**220.** *See, e.g., Madsen,* 512 U.S. at 770, 114 S.Ct. 2516 ("Protesters standing across the narrow street from the clinic can still be seen and heard from the clinic parking lots."). Plaintiffs may try to establish otherwise during their as-applied challenge, but there is no basis for such a finding at the facial challenge stage.

### ii. Plaintiffs' Approach Argument

Plaintiffs argue that "[t]he First Amendment protects the right of speakers to communicate with their intended audience from a normal conversational distance, and distances of 15 feet or more do not, as a matter of law, allow for normal conversation."[221]

The Supreme Court, however, has repeatedly upheld fixed buffer zones that have the effect of limiting normal conversation within the zone. For example, in *Madsen* and *Schenck*, respectively, the Court upheld 36-foot and 15-foot fixed buffer zones around RHCF entrances and driveways.[222]

Plaintiffs, however, urge that *Schenck* supports their position. There, the Court addressed both a floating and a fixed buffer zone. The floating zone required all protesters to stay at least 15 feet away from any individual or vehicle seeking access to or leaving an RHCF, regardless of the person or vehicle's location.[223] The fixed buffer zone prohibited "demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities."[224]

The Court observed that the floating buffer zone "prevented defendants . . . from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks," and that this was a "broad prohibition, both because of the type of speech that is restricted and the nature of the location."[225] But, "[o]n the other hand, we have before us a record that shows physically abusive conduct, harassment of the police that hampered law enforcement, and the tendency of even peaceful conversations to devolve into aggressive and sometimes violent conduct. In some situations, a record of abusive conduct makes a prohibition on classic speech in limited parts of a public sidewalk permissible."[226]

The Court, however, declined to decide "whether the governmental interests involved would ever justify some sort of zone of separation between individuals entering the clinics and protesters, measured by the distance between the two."[227] Instead, the Court held that "because this broad prohibition on speech 'floats,' it cannot be sustained on this record."[228] The Court explained:

> [I]t would be quite difficult for a protester who wishes to engage in peaceful expressive activities to know how to remain in compliance with the injunction. This lack of certainty leads to a substantial risk that much more speech will be burdened than the injunction by its terms prohibits. That is, attempts to stand 15 feet from someone entering or leaving a clinic and to communicate a message—certainly protected on the face of the injunction—will be hazardous

---

221. PFF at 29.

222. *Madsen*, 512 U.S. at 768–71, 114 S.Ct. 2516; *Schenck*, 519 U.S. at 374–76, 117 S.Ct. 855. Likewise, albeit in a different context, the Court upheld a 100–foot fixed "campaign free" zone around polling places. *See Burson v. Freeman*, 504 U.S. 191, 210–11, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992).

223. *See Schenck*, 519 U.S. at 366, 117 S.Ct. 855.

224. *Id.* (internal quotation marks omitted).

225. *Id.* at 377, 117 S.Ct. 855.

226. *Id.*

227. *Id.*

228. *Id.*

if one wishes to remain in compliance with the injunction.[229]

Significantly, however, the Court *upheld* the 15–foot fixed buffer zone around RHCF entrances and driveways,[230] even though the effect on conversation was similar.

Here, the buffer zone is fixed, not floating. Accordingly, the Court's concern regarding the uncertainty that attaches to a floating zone disappears. A fixed zone provides a bright-line rule for violations: if you are a non-exempt person in the zone, you are violating the Act.[231] Moreover, as discussed in the narrowly tailored analysis, this court finds that the substantial governmental interests involved here justify the creation of the 35–foot fixed buffer zone.

Additionally, although the Supreme Court cases control the holding here, this court briefly notes the First Circuit's decision in *Bl(a)ck Tea Society v. City of Boston*.[232] There, the First Circuit considered and upheld the establishment of a "designated demonstration zone" for the 2004 Democratic National Convention.[233]

The designated zone "allowed no opportunity for physical interaction (such as the distribution of leaflets) and severely curtailed any chance for one-on-one conversation."[234] The court held, however, among other things, that "although the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access."[235]

The same applies here. Although slightly closer physical interaction may partially enhance one's ability to sidewalk counsel RHCF patients, there is no constitutional right to that level of particularized access.

### 4. Conclusion Regarding Time, Place and Manner Restriction

For the foregoing reasons, this court finds that the 2007 Act (1) is justified without reference to the content of the regulated speech; (2) is narrowly tailored to serve significant governmental interests; and (3) leaves open ample alternative channels for communication. Accordingly, the Act is a lawful time, place and manner restriction, and Defendant prevails on Count I of Plaintiffs' Complaint.

### D. Note on Public Forum Doctrine

Although Plaintiffs do not press a separate public forum challenge, Plaintiffs correctly note that sidewalks and streets are " 'quintessential' public forums."[236] Plaintiffs also dedicate a section of their brief to the subject of free speech on public streets and sidewalks.[237] Accordingly, this court

---

**229.** *Id.* at 378, 117 S.Ct. 855 (internal citations omitted).

**230.** *Id.* at 380–81, 117 S.Ct. 855 ("We uphold the fixed buffer zones around the doorways, driveways, and driveway entrances. These buffer zones are necessary to ensure that people and vehicles trying to enter or exit the clinic property or clinic parking lots can do so....").

**231.** This also provides the police with clear guidelines for enforcing the law.

**232.** 378 F.3d 8 (1st Cir.2004).

**233.** *Id.* at 10.

**234.** *Id.* at 13.

**235.** *Id.* at 14.

**236.** *See* PFF at 18 (*citing Frisby v. Schultz*, 487 U.S. 474, 481, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988); *United States v. Grace*, 461 U.S. 171, 179, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)).

**237.** *See* "The Nature of Public Streets and Sidewalks," *id.* at 18–19; "Free Speech on Public Streets and Sidewalks," *id.* at 20–22.

will conduct a separate public forum analysis.

Governments can regulate public forums if the restrictions meet the appropriate level of scrutiny. As noted, while content-based regulations must survive strict scrutiny,[238] content-neutral time, place and manner restrictions must pass intermediate scrutiny.[239]

Here, the Act clearly can affect sidewalks and streets in the vicinity of RHCFs, and is thereby subject to the public forum doctrine. For the reasons above, however, the Act is content-neutral, time, place and manner regulation. Accordingly, intermediate scrutiny applies, and this court has already held that the Act passes this level of scrutiny. The Act, therefore, also survives a separate public forum challenge.

### E. Count II. Overbreadth Challenge

■ Plaintiffs also assert that the Act is overbroad because it burdens more speech than is necessary to achieve a substantial and legitimate government interest. There are two main parts to this argument. First, Plaintiffs argue that the "statute bans from the zone all types of speech ... and all manner of speech ... not only the abortion-related speech .... [,]"[240] and the government's interest is not served by such a broad ban.[241] Second, Plaintiffs argue that the statute unconstitutionally burdens personal liberty interests, because it "prohibits virtually all persons from standing in or utilizing the zone for any and all purposes other than 'reaching a destination other than such facility.'"[242]

The Supreme Court rejected similar arguments in *Hill v. Colorado*, and the Court's analysis applies with equal weight here. There, the Court held, "The fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance. What is important is that all persons entering or leaving health care facilities share the interests served by the statute."[243] Here, all persons entering and exiting the health care facilities share the legitimate health and safety interests served by the Act.

Furthermore, as noted in the content-neutral discussion, the Act's "comprehensiveness ... is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive."[244] Indeed, "there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally."[245]

Additionally, as already noted, the Act "simply does not 'ban' any messages, and likewise it does not 'ban' any signs, literature, or oral statements. It merely regulates the places where communications may occur."[246]

---

238. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

239. *Id.* ("The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.").

240. PFF at 33.

241. *See id.* at 35–36.

242. *See id.* at 34 (*quoting* Mass. Gen. Laws ch. 266, § 120E1/2(b) (2007)).

243. *Hill*, 530 U.S. 703, 730–31, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

244. *Id.* at 731, 120 S.Ct. 2480.

245. *Id.*

246. *Id.*

Addressing Plaintiffs' overbreadth argument more generally, "a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." [247] The Court, however, "vigorously enforce[s]" the substantiality requirement, "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." [248] Additionally, "[t]he overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort.' " [249]

On the record before this court on Plaintiffs' facial challenge, Plaintiffs have not established that "the impact of the statute on the conduct of other speakers will differ from its impact on their own sidewalk counseling." [250] "Like [Plaintiffs'] own activities, the conduct of other protesters and counselors at all health care facilities are encompassed within the statute's 'legitimate sweep.' " [251] Accordingly, Count II must fail.

### F. Count III. Prior Restraint

■ Plaintiffs also assert that the Act constitutes an impermissible prior restraint on speech in violation of the First and Fourteenth Amendments. The Act, however, is not a prior restraint, because the Commonwealth "has not sought to prevent speech, but, rather, to regulate the place and manner of its expression." [252] Indeed, "The Supreme Court has explicitly rejected attempts to analyze security-based time-place-manner restrictions as prior restraints," including in *Hill*, *Schenck* and *Madsen*, "and those cases are controlling here." [253] As cautioned by the First Circuit, "If content-neutral prohibitions on speech at certain places were deemed prior restraints, the intermediate standard of review prescribed in the time-place-manner jurisprudence would be eviscerated." [254]

Accordingly, Count III of Plaintiffs' Complaint fails.

---

**247.** *Wash. State Grange v. Wash. State Republican Party*, —— U.S. ——, —— n. 6, 128 S.Ct. 1184, 1191 n. 6, 170 L.Ed.2d 151 (2008) (*citing New York v. Ferber*, 458 U.S. 747, 769–71, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (internal citations and quotation marks omitted)). See also *Hill*, 530 U.S. at 732, 120 S.Ct. 2480 (" 'particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' ") (*quoting Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

**248.** *United States v. Williams*, —— U.S. ——, ——, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650 (2008) (*citing Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908).

**249.** *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (*quoting Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908). *See also Williams*, 128 S.Ct. at 1838; *Wash. State Grange*, 128 S.Ct. at 1191 n. 6.

**250.** *Hill*, 530 U.S. at 732, 120 S.Ct. 2480.

**251.** *Id.*

**252.** *Bl(a)ck Tea Society*, 378 F.3d 8, 12 (1st Cir.2004).

**253.** *Id.* (*citing Hill*, 530 U.S. at 733–34, 120 S.Ct. 2480; *Schenck*, 519 U.S. at 374 n. 6, 117 S.Ct. 855; *Madsen*, 512 U.S. at 763 n. 2, 114 S.Ct. 2516).

**254.** *Id.*

### G. Count IV. "Free Speech—Free Association—Free Exercise Hybrid"

Plaintiffs also argue that "the Act implicates rights to free speech, free assembly, free association and free exercise of religion,"[255] and that "[i]nfringement of the right to free exercise of religion exercised in combination of other fundamental constitutional rights subjects the Act to strict scrutiny review."[256] This court will first address each of these rights individually.

#### 1. Free Exercise Claim

██ "The Free Exercise Clause also is made applicable to the states (and, therefore, to municipalities) through the Fourteenth Amendment."[257] The clause states that "Congress shall make no law . . . prohibiting the free exercise [of religion]. . . ."[258] If, however, " 'a law . . . is neutral and of general applicability,' " it " 'need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.' "[259]

Here, this court has already determined that the Act is a generally-applicable, content-neutral statute that passes intermediate scrutiny. The Act does not regulate speech, expression, prayer, singing, worship or display of religious articles. It merely regulates where such expression may take place, i.e., outside of a clearly marked buffer zone during the normal business hours of an RHCF. The Act also applies to all non-exempt persons equally. As a result, this court is "bound to conclude that the regulation does not discriminate against a particular religion or religious practice."[260] Accordingly, as a matter of law, Plaintiffs "cannot rewardingly invoke the Free Exercise Clause in their attack on the regulation."[261]

#### 2. Freedom of Speech

This court has already determined that the Act is a lawful, content-neutral time, place and manner restriction; is not overbroad; and does not constitute a prior restraint. Accordingly, Plaintiffs' free speech claim fails.

#### 3. Freedom of Assembly and Association

██ The Supreme Court has held, "Regulations imposing severe burdens on plaintiffs' [associational] rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."[262]

██ Here, the Act does not impose a "severe" burden on a protester's right to assemble or associate. As noted above, the Act permits ample alternative channels of communication, because, among other things, individuals are free to demonstrate and associate outside the buffer zone.

---

255. Pl. Mem. of Law in Supp. of Mot. for Prelim. Inj. at 39.

256. Compl. at 18.

257. *Knights of Columbus v. Town of Lexington,* 272 F.3d 25, 35 (1st Cir.2001) (*citing Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

258. U.S. Const. Amend. I.

259. *Knights of Columbus,* 272 F.3d at 35 (*quoting Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)).

260. *Id.*

261. *Id.*

262. *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (internal citations and quotation marks omitted).

Moreover, for the reasons above, the Commonwealth's interests are of sufficient importance to justify the 35–foot fixed buffer zone. Accordingly, the Act does not violate the First Amendment's right to associate or assemble peaceably.

### 4. No Hybrid Cause of Action

All of Plaintiffs' First Amendment individual claims fail, leaving Plaintiffs' "hybrid" cause of action. Again, Plaintiffs argue that "heightened review applies when free exercise rights are infringed in combination with other fundamental constitutional rights." [263]

Although the First Circuit has yet to decide the "hybrid rights" issue definitively,[264] this court declines to apply strict scrutiny to the instant case.[265] After reviewing all of Plaintiffs constitutional claims on an individual basis and finding no violation, this court will not engage in multiplication theory. Notwithstanding the Supreme Court's dicta in *Smith*,[266] there is no basis in the Constitution for heightening the level of review simply based on the number of rights asserted or implicated in a case.[267] Either a plaintiff

---

**263.** Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 39. Plaintiffs base this count on *Employment Div., Dept. of Human Resources of Oregon v. Smith,* where the Court observed, "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press...." 494 U.S. 872, 882, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), *rehearing denied,* 496 U.S. 913, 110 S.Ct. 2605, 110 L.Ed.2d 285 (1990) (subsequent history omitted).

**264.** *See Parker v. Hurley,* 514 F.3d 87, 98 (1st Cir.2008) (declining to "enter[ ] the fray over the meaning and application of *Smith's* 'hybrid situations' language"). The court did, however, note that "[n]o published circuit court opinion, including *Brown [v. Hot, Sexy & Safer Productions,* 68 F.3d 525 (1st Cir. 1995)], has ever applied strict scrutiny to a case in which plaintiffs argued they had presented a hybrid claim." *Id.* at 98. Additionally, "[o]ther circuits have held explicitly that *Smith* does not create a new category of hybrid claims." *Id.*

**265.** The court has already held that the Act passes intermediate scrutiny.

**266.** The Court's observation was incidental and unnecessary to the outcome of the case. Indeed, the Court specifically acknowledged, "The present case does not present such a hybrid situation." *Smith,* 494 U.S. at 882, 110 S.Ct. 1595. Accordingly, the comment is dicta and non-binding. *See, e.g., Leebaert v.*

*Harrington,* 332 F.3d 134, 143 (2d Cir.2003) ("We have held, by contrast, in the context of claims involving free exercise and free speech, that Smith's 'language relating to hybrid claims is dicta and not binding on this court.'") (*quoting Knight v. Conn. Dep't of Pub. Health,* 275 F.3d 156, 167 (2d Cir.2001)). This court also does not believe that the statement rises to the level of a "carefully considered statement" recognized by the First Circuit as controlling precedent. *See United States v. Santana,* 6 F.3d 1, 9 (1st Cir.1993).

**267.** *See, e.g., Leebaert,* 332 F.3d at 144 ("We too can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated. Therefore, at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard to evaluate hybrid claims.") (internal citations and quotation marks omitted); *Kissinger v. Bd. of Trustees of Ohio State Univ.,* 5 F.3d 177, 180 (6th Cir.1993) ("We do not see how a state regulation would violate the Free Exercise Clause if it implicates other constitutional rights but would not violate the free Exercise Clause if it did not implicate other constitutional rights."). *See also Hialeah,* 508 U.S. at 567, 113 S.Ct. 2217 (Souter, J., concurring) ("[T]he distinction *Smith* draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule, and, indeed, the hybrid exception would cover the situation exemplified by *Smith,* since free speech and

has a constitutional claim or she does not.[268] Accordingly, Count IV of the Complaint also fails.

### Discussion: Count VIII. Equal Protection Challenge

Plaintiffs also assert that the employees/agents exemption of the Act violates the Equal Protection Clause. As such, Plaintiffs argue that the Act "impinges fundamental rights and liberty interests and therefore is subject to strict scrutiny review."[269] This court's other holdings regarding the Act, however, and the case law, foreclose such an argument.

■ "From time to time, the Supreme Court has invoked equal protection rather than free speech, as the basis for invalidating a content-based speech restriction."[270]

"But where the state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily passes the rational basis test employed under the Equal Protection Clause."[271]

Here, as discussed above, the exemption is content-neutral and there are satisfactory rationales for the exemption. Accordingly, "the Act passes muster under the Equal Protection Clause for the same reasons that it passes muster under the First Amendment."[272]

Furthermore, as explained above, intermediate scrutiny applies, not strict scrutiny.[273] Because this court has already held that the Act survives intermediate scrutiny, Count VIII of Plaintiffs' Complaint also fails.

---

associational rights are certainly implicated in the peyote ritual. But if a hybrid claim is one in which a litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason for the Court in what *Smith* calls the hybrid cases to have mentioned the Free Exercise Clause at all.").

**268.** This court notes, however, that even assuming the existence of a "hybrid rights" doctrine, Plaintiffs' "hybrid" claim would still fail. Under the doctrine, a plaintiff must still establish an independently viable constitutional violation, or at least a "colorable" associated claim. *See, e.g., Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 765 (7th Cir.2003) ("Based on the analyses of Appellants' speech, assembly, and equal protection claims that follow, however, we find them individually lacking the merit necessary to withstand summary judgment.... Appellants have identified no constitutionally protected interest upon which the [statute] infringes, as they must in order to establish a hybrid rights claim requiring heightened scrutiny."); *EEOC v. Catholic University of America*, 83 F.3d 455, 467 (D.C.Cir.1996) (acknowledging a "hybrid situation," but finding no independently viable constitutional claim). See also *Thomas v. Anchorage Equal Rights*

*Comm'n*, 220 F.3d 1134, 1148 (9th Cir.2000) (characterizing *EEOC* as "requiring that a free exercise claim based on the hybrid rights exception must include an independently viable claim of infringement of a companion right"). For the "colorable" claim requirement, see, for example, *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 656 (10th Cir.2006) (explaining that "hybrid rights exception" requires a "colorable independent constitutional claim"). Here, for the reasons above, Plaintiffs have not established either. Accordingly, any "hybrid" claim would fail.

**269.** Compl. at 22.

**270.** *McGuire I*, 260 F.3d at 49.

**271.** *Id.* at 49–50.

**272.** *Id.* at 50.

**273.** *See, e.g., Sullivan v. City of Augusta*, 511 F.3d 16, 32–33 (1st Cir.2007) ("Unlike regulations that are not content-neutral, which are reviewed under a harsher strict-scrutiny standard, ... content-neutral regulations are reviewed under so-called intermediate scrutiny.").

## Discussion: Due Process Challenges

### A. Count VI. Vagueness

#### 1. Plaintiffs' Position

█ Plaintiffs argue that the Act is unconstitutionally vague because of one of the Act's exemptions.[274] Exemption four excludes from the Act's coverage "persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility."[275]

Plaintiffs find two words of the exemption problematic. First, Plaintiffs argue that "solely" is unclear, "because there are often multiple reasons for persons to travel from one place to another."[276] Second, Plaintiffs argue that "destination" is unclear, "because a person need not have a destination as a reason to use a public sidewalk."[277]

Plaintiffs also argue that "it is unclear whether the statute permits plaintiffs to walk through the zone carrying a sign, or wearing a t-shirt or hat with an abortion-related or partisan message."[278] According to Plaintiffs, "Based on the Attorney General's guidance letter, it appears they cannot," because, "[a]s construed by the Attorney General, the term 'partisan speech' is undefined, forcing a person to guess about the conduct proscribed."[279]

#### 2. Attorney General's Guidance

As noted above, the Attorney General's 2008 Guidance Letter addresses all of the exemptions, including the fourth:

Finally, the fourth exemption—for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic—applies to individuals who are crossing through the buffer zone, without stopping, to go somewhere other than a location within the zone and other than the clinic, and who are not using the buffer zone for some other purpose while passing through. For example, an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech).[280]

#### 3. Legal Standard for Vagueness

█ The Due Process Clause of the Fifth Amendment " 'mandates that, before any person is held responsible for violation of the criminal laws of this country, the conduct for which he is held accountable be prohibited with sufficient specificity to forewarn of the proscription of said conduct.' "[281] Accordingly, " '[a]s generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' "[282]

---

**274.** See Compl. at 19–20; PFF at 42–43.

**275.** Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2000), *amended by* Mass. Gen. Laws ch. 266 § 120E 1/2(b) (2007) (spacing modified) (Trial Ex. 3).

**276.** PFF at 42.

**277.** *Id.* at 43.

**278.** *Id.*

**279.** *Id.*

**280.** 2008 Guidance Letter at 3 (Trial Ex. 26).

**281.** *United States v. Lachman,* 387 F.3d 42, 56 (1st Cir.2004) (*quoting United States v. Anzalone,* 766 F.2d 676, 678 (1st Cir.1985)).

**282.** *Id.* at 56 (*quoting Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) and *citing Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d

"The mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague."[283] Indeed, " 'Many statutes will have some inherent vagueness.... Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.' "[284]

Lastly, as acknowledged by Plaintiffs,[285] "[i]n evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered."[286]

### 4. Vagueness Standard Applied

Reading the statute "as a whole,"[287] this court finds the exemption to be clear on its face. "Solely," meaning "to the exclusion of all else,"[288] should not confuse a person of ordinary intelligence.[289] The exemption applies if an individual walks through the zone with the sole purpose of walking home or to work or to the store. Additionally, if a counselor or protester decides to walk through the zone with the *sole* purpose of getting to the other side, the ex-

emption applies. What the statute prohibits is walking through the zone with the purpose of engaging in an activity *other than* reaching the other side. This would clearly not be passing through the zone "to the exclusion of all else."

Moreover, the word "destination," meaning "the place to which one is journeying,"[290] is also clear. Plaintiffs disagree, and argue, as an example, that a person jogging or strolling does not necessarily have a destination. This argument is unpersuasive. A jogger's destination is to the end of his run, which may be at the end of the block or in the next neighborhood. Indeed, for purposes of the exemption, any destination is fine, so long as it is not in the middle of a clearly marked buffer zone during an RHCF's business hours. Even the aimless stroller has a likely destination in mind before she turns around. In any event, the word is sufficiently clear for ordinary people to understand.

Furthermore, even assuming that the exemption requires some degree of explanation, the Attorney General's interpretation eliminates any possible confusion.[291]

---

222 (1972); *Bouie v. City of Columbia*, 378 U.S. 347, 350–51, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964)). *See also United States v. Williams*, — U.S. —, —, 128 S.Ct. 1830, 1845, 170 L.Ed.2d 650 (2008) ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.").

**283.** *Id.*

**284.** *Id.* (quoting *Rose v. Locke*, 423 U.S. 48, 49–50, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975)).

**285.** *See* PFF at 18.

**286.** *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 495 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (*citing Grayned*, 408

U.S. at 110, 92 S.Ct. 2294). *See also McGuire II*, 386 F.3d at 58 (internal citations and quotation marks omitted).

**287.** *See Schenck v. Pro–Choice Network*, 519 U.S. 357, 383, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (*citing Grayned*, 408 U.S. at 110, 92 S.Ct. 2294).

**288.** *Merriam–Webster's Collegiate Dictionary* 1114 (Definition 2) (10th ed.2000).

**289.** *Williams*, 128 S.Ct. at 1845.

**290.** *Id.* at 314 (Definition 3).

**291.** Again, although this court considers the statute clear on its face, "[t]he mere fact that a statute ... requires interpretation does not render it unconstitutionally vague." *Lachman*, 387 F.3d at 56.

Not only is the Attorney General's construction reasonable, it comports with a common sense and plain read of the language.

Also, despite Plaintiffs' contention, the Attorney General's guidance is clear. The 2008 Guidance Letter states, "an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech)." [292]

Although Plaintiffs claim to be confused by this, displaying signs or shirts with abortion-related or partisan messages clearly qualifies as "expressing their views about abortion," which counts as "do[ing] anything else within the buffer zone." [293] As such, the Attorney General's interpretation specifically prohibits this type of conduct.[294] After all, if individuals could simply walk back and forth all day in the buffer zone engaging in various activities, the main goals of the statute—ensuring public safety and guaranteeing unimpeded and safe access for patients—would be severely frustrated.

Contrary to Plaintiffs' assertion, the phrase "partisan speech" is also not vague

such that an ordinary person is "forc[ed] ... to guess about the conduct proscribed." [295] An ordinary person understands "partisan" as support for political party or cause. The formal definition is also consistent with the contemporary use of the word: when used as an adjective, "partisan" means embodying "a firm adheren[ce] to a party, faction, cause or person." [296] Especially when used in the context of "abortion ... or other partisan speech," [297] an ordinary person would understand that the provision refers to political or cause-related speech. Accordingly, this provides people of ordinary intelligence a reasonable opportunity to understand which type of conduct is prohibited.

Moreover, the Attorney General's interpretation is authoritative. The Attorney General is the Commonwealth's chief law enforcement officer, and she sent the guidance letter to all law enforcement agencies with an RHCF in their jurisdiction.[298] This court has no reason to believe that the guidance will be anything but strictly heeded. Additionally, if past experience in the *McGuire* line of cases serves as a guide, law enforcement will interpret the statute in a manner consistent with the Attorney General's position.

Finally, despite Plaintiffs' argument to the contrary,[299] nothing in the exemption itself or the Attorney General's interpretation appears to encourage arbitrary and discriminatory enforcement.[300] The ex-

292. 2008 Guidance Letter at 2 (Trial Ex. 26).

293. *Id.*

294. Indeed, and despite their alleged confusion, Plaintiffs appear to acknowledge as such: "On its face, it is unclear whether the statute permits plaintiffs to walk though the zone carrying a sign, or wearing a t-shirt or hat with an abortion-related or partisan message. *Based on the Attorney General's guidance letter, it appears they cannot.*" PFF at 43 (emphasis added).

295. *Id.*

296. *Merriam–Webster's Collegiate Dictionary* 845 (Definition 1).

297. 2008 Guidance Letter at 2 (Trial Ex. 26).

298. *See* Narayanan Aff. at 1 (Trial Ex. 26).

299. *See* Compl. at 20; PFF at 42.

300. Indeed, the fixed buffer zone itself provides clearer guidance to law enforcement than its predecessor. Instead of a floating buffer zone with a subjective "approach" requirement, the fixed buffer zone—which is clearly marked on the pavement—provides

emption and the Attorney General's interpretation of the exemption are clear for the reasons above. Additionally, to the extent the "solely" determination requires a judgment call, " '[a]s always, enforcement requires the exercise of some degree of police judgment.' " [301] As in *Hill*, at least facially, "the degree of judgment involved here is acceptable." [302]

For these reasons, the Act is not unconstitutionally vague, and Count VI of Plaintiffs' Complaint fails.

## B. Count VII. Liberty Interest

■■■ Count VII of the Complaint alleges violation of Plaintiffs' liberty interests protected by the Due Process Clause. Plaintiffs base this claim on the "freedom to loiter for innocent purposes," and "their rights to intrastate travel in violation of the Fourteenth Amendment." [303] Although Plaintiffs did not press this cause of action at the Bench Trial, this court will address it briefly.

Plaintiffs support this cause of action [304] by reference to *City of Chicago v. Morales*.[305] There, the Supreme Court addressed Chicago's "Gang Congregation Ordinance," which prohibited "criminal street gang members" from "loitering" in public places.[306] In addressing the overbreadth doctrine, Justice Stevens noted, writing for the plurality, "[T]he freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." [307]

The Court, however, explicitly declined "to decide whether the impact of the Chicago ordinance on constitutionally protected liberty alone would suffice to support a facial challenge under the overbreadth doctrine." [308] Instead, the Court found the law unconstitutionally vague.[309] The "freedom to loiter" reference, therefore, was dicta and not precedential.[310]

Even acknowledging, however, a "right to loiter," this court agrees with the Seventh Circuit that "it is not at all clear, and indeed, quite improbable, that Justice Stevens undertook in this statement any type of fundamental rights analysis." [311] Accordingly, even assuming Plaintiffs are "seeking a right to enter" the areas immediately adjacent to RHCF entrances and driveways "simply to wander and loiter innocently," this court "cannot characterize that right as 'fundamental.' " [312]

As a result, this court applies rational basis review to this count.[313] This court

---

police with a bright-line basis to assess violations. A non-exempt person is either inside the zone or outside the zone.

**301.** *Hill*, 530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (*quoting Grayned*, 408 U.S. at 114, 92 S.Ct. 2294).

**302.** *Id.*

**303.** Compl. at 21.

**304.** *See* Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 33.

**305.** 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).

**306.** *Id.* at 45–46, 119 S.Ct. 1849.

**307.** *Id.* at 53, 119 S.Ct. 1849.

**308.** *Id.* at 55, 119 S.Ct. 1849.

**309.** *Id.* at 55–64, 119 S.Ct. 1849.

**310.** This court also does not believe that the statement rises to the level of a "carefully considered statement" recognized by the First Circuit as controlling precedent. *See United States v. Santana*, 6 F.3d 1, 9 (1st Cir.1993).

**311.** *Doe v. City of Lafayette*, 377 F.3d 757, 772 (7th Cir.2004).

**312.** *Id.* at 772–773.

**313.** *See id.* at 773 ("Because we have concluded that the City's ban does not encroach on a fundamental liberty interest, we are bound to apply the rational basis standard of review to the City's ban.").

has already held, however, that the Act passes intermediate scrutiny. This ends the analysis, and Plaintiffs' liberty interests count also fails.

## Conclusion

For the foregoing reasons, the Act survives under all three facial challenge standards. Because the Act passes constitutional muster under the First Amendment, the Equal Protection Clause and the Due Process Clause, Plaintiffs have fallen far short of establishing that "no set of circumstances exists under which the Act would be valid." [314] Furthermore, the Act has a "plainly legitimate sweep." [315] Lastly, Plaintiffs have failed to establish that the Act is impermissibly overbroad.[316]

Because Defendant prevails on all counts of Plaintiffs' facial challenge, Plaintiffs' request for preliminary and permanent injunctive relief is DENIED.[317]

This matter now proceeds to Plaintiffs' as-applied challenge. A Status Conference shall be held to establish a discovery schedule and trial date.

IT IS SO ORDERED.

---

**314.** 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

**315.** *Wash. State Grange v. Wash. State Republican Party,* —— U.S. ——, ——, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151 (2008) *(quoting Washington v. Glucksberg,* 521 U.S. 702, 739–40, and n. 7, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring in judgments)).

**316.** *See id.* at 1191 n. 6 *(citing New York v. Ferber,* 458 U.S. 747, 769–71, 102 S.Ct. 3348,

73 L.Ed.2d 1113 (1982) and *quoting Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

**317.** *See, e.g., McDonald's Corp. v. Rappaport,* 532 F.Supp.2d 264, 275 n. 67 (D.Mass.2008) (Tauro, J.) ("Because [Plaintiff] has not prevailed on the merits, and all four elements of the injunction standard must be met for an injunction to issue, this court need not address the remaining elements of the standard.").